Antonio JOHNSON, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2013-SC-000209-MR

Supreme Court of Kentucky.

RENDERED: DECEMBER 18, 2014

COUNSEL FOR APPELLANT: Roy Alyette Durham, II, Assistant Public Advocate, Department of Public Advocacy

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, Mathew Robert Krygiel, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals

## OPINION OF THE COURT BY JUSTICE VENTERS

Appellant, Antonio Michael Johnson was a convicted felon on May 28, 2011, when he had an altercation with his girlfriend. During the incident, he made threats against his girlfriend and her son, and he assaulted his girlfriend by twice slamming her head into a wall. He also fired several shots from a .22 caliber handgun. Police later discovered the .22 caliber handgun in Appellant's vehicle along with a .44 caliber handgun with the serial number scratched off.

Following a jury trial in the Christian Circuit Court, Appellant was convicted of third-degree terroristic threatening, two counts of possession of a handgun by a convicted felon, possession of a defaced firearm, and of being a first-degree persistent felony offender. He was sentenced to a total of twenty-year imprisonment. He appeals as a matter of right.

As grounds for relief from the judgment, Appellant contends that (1) the trial court erred by failing to dismiss the charges or, alternatively, to grant a continuance, based upon a violation of the 180–day speedy trial provision contained in the Interstate Agreement on Detainers (IAD), KRS 440.450–KRS 440.510; (2) a *Batson*–violation occurred as a result of one of the peremptory strikes made by the Commonwealth; and (3) the prosecutor made improper statements about him during his closing argument.

For the reasons explained below we conclude that a *Batson* violation occurred, which, under the circumstances of this case, requires us to vacate Appellant's conviction, and remand the case to the Christian Circuit Court for a new trial. We address Appellant's other issues that may arise again in the circuit upon remand.

## I. THE INTERSTATE AGREEMENT ON DETAINERS, KRS 440.450–KRS 440.510, WAS NOT VIOLATED

Appellant argues that the trial court erred by failing to dismiss the charges based upon a violation of the 180–day speedy trial requirement of KRS 440.450 Art. III(1). Appellant contends that he timely and adequately filed his paperwork to invoke the IAD 180–day trial requirement, and that the court and the Commonwealth thereafter failed to bring him to trial within the 180–day limit. Alternatively, Appellant contends that the trial court violated the IAD by granting the Commonwealth's motion for a continuance which delayed his trial beyond the 180–day limit. We begin our review with a summary of the relevant chronology.

Following the altercation of May 28, 2011, an arrest warrant was issued for Appellant; however, he could not be immediately located. In November 2011, Appellant was arrested and incarcerated in the Montgomery County Jail in Clarksville, Tennessee. After learning of his incarceration, the Christian County Attorney filed an IAD detainer with the Montgomery County Jail, pursuant to KRS 440.450 Art. III(1).

On May 8, 2012, after the detainer had been lodged, Appellant invoked the IAD's 180–day trial provisions by having the warden of the jail mail his IAD trial request forms to the Christian Circuit Court Clerk. The forms were delivered on May 11, 2012; 180 days from that delivery date was No-

vember 7, 2012. Although the detainer had been lodged by the Christian *County Attorney,* Appellant's IAD paperwork identified the Christian County *Commonwealth's Attorney* as the "Prosecuting Officer." Consequently, the applicable forms were delivered to that office rather than to the County Attorney's office. Appellant now concedes that he incorrectly designated the Commonwealth's Attorney rather than the County Attorney as the "Prosecuting Officer" for receipt of his IAD trial request.

Appellant was indicted in September, 2012. Although his defense counsel, the prosecutor, and the trial judge were each unaware of Appellant's IAD filing, a trial date was set for November 5, 2012.[1] At a subsequent pretrial status conference, the IAD filings were discovered but it was initially perceived to be of no import because the trial date was set two days prior to the expiration of the 180–day IAD deadline. However, shortly before trial, the Commonwealth was unable to serve the primary victim with a subpoena. The prosecutors believed she was avoiding service because she was afraid of Appellant. For that reason, the Commonwealth moved for a continuance; the Appellant objected to the postponement of the trial.

The trial court granted a limited continuance pursuant to KRS 440.450 Article III(1)[2] in order to determine the validity of Appellant's IAD trial request and whether "good cause" existed for granting the Commonwealth's request for a continuance. Soon thereafter, the trial court entered an order concluding that by addressing his IAD request notice to the wrong prosecuting official, Appellant had failed to comply with the IAD, and his request for trial within 180–days was ineffective. The trial court also held that "[e]ven if [Appellant] had strictly complied with the IAD, the Commonwealth has shown good cause for a continuance" due in part to "the difficulty in locating and obtaining the presence of its key witnesses." The trial was eventually held on January 24, 2013, 258 days after Appellant's IAD forms were delivered to the Christian Circuit Court Clerk's office, and less than five months after his indictment.

The 180–day time period established by the IAD does not commence until a detainee's request for final disposition of the charges against him has actually been delivered to the appropriate court and to the prosecuting officer that lodged the detainer against him. *Fex v. Michigan,* 507 U.S. 43, 52, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993). Article III of the IAD, codified at KRS 440.450(1) requires that in order to invoke the 180–day IAD rule, a detainee inmate, *inter alia, "shall have caused to be delivered to the prosecuting officer* ... his request for a final disposition to be made of the indictment, information or complaint[.]" Pursuant to KRS 440.450(2), he does this by giving his request for final disposition to the "warden," or other official having custody of him, who must then forward the IAD request as directed by the detainee's paperwork. Because it is the detainee who "shall have caused" the delivery of the IAD forms to the proper

---

**1.** It is unclear why Appellant did not inform his counsel, or anyone else, about his IAD filing. It appears that, because Appellant's IAD filings arrived before he was indicted and before the Commonwealth's Attorney's had an indictment file on him, that office may have not recognized the significance of the IAD filing when it arrived.

**2.** KRS 440.450 Article 111(1)provides in pertinent part: "... provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

prosecuting officer, the statutory text clearly places the responsibility for the accuracy of the notice upon the prisoner. *See Clutter v. Commonwealth,* 322 S.W.3d 59 (Ky.2010).

In *Clutter,* we emphasized the necessity of strict compliance with the procedures of Article III of the IAD. *Id.* at 63–64, citing *Ellis v. Commonwealth,* 828 S.W.2d 360, 361 (Ky.1992). We further noted, however, that a limited exception to the requirement of strict compliance applied, "only when strict compliance is thwarted by a public official despite a prisoner's having done everything possible to achieve strict compliance." *Id.* at 64.

In this case it was the Appellant himself, not a public official, who caused the IAD paperwork to be delivered to the wrong prosecuting officer. Accordingly, Appellant was not "thwarted by a public official despite [his] having done everything possible to achieve strict compliance." As such, we are persuaded that the trial court properly concluded that Appellant had not strictly complied with the IAD requirement that his paperwork be sent to the proper prosecuting official.[3]

■ Moreover, even if we were to accept Appellant's argument and shift the blame to the warden or to someone else, we would nevertheless conclude that the trial court did not abuse its discretion by granting the Commonwealth's request for a continuance. The lack of awareness of Appellant's IAD request among his defense counsel, the trial court, and the prosecutor, in combination with the difficulty in securing the attendance of an apprehensive witness, amply support the trial court's finding, pursuant to KRS 440.450 Article III($l$), that good cause existed to delay the trial.

## II. THE *BATSON* VIOLATION

The Appellant is African–American. The initial venire included five African–Americans, but following strikes for cause only two remained at the beginning of the peremptory strike phase. The Commonwealth then exercised a peremptory strike against Juror Fourteen, one of only two remaining African–Americans. Invoking *Batson,*[4] Appellant challenged the strike. The prosecutor responded, "One out of five does not establish a pattern by any measure *so I don't think we are required to give a race-neutral reason,*" indicating a mistaken belief that *Batson* prohibited challenges to racially-motivated preemptive strikes only when the prosecution had engaged in a "pattern" of prior strikes of African–American jurors. Recognizing that the prosecutor's response was contrary to well-established law,[5] the trial court promptly required the Commonwealth to posit a race-neutral reason for the strike.

The following exchange then occurred:

---

3. There was evidence indicating that the circuit court clerk's office placed a copy of Appellant's IAD-filing in a clerk's office mailbox designated for the county attorney, and Appellant relies upon this possibility to argue that the county attorney, therefore, had "constructive notice" of the filing. Addressing this point, the trial court found that "there is no way to be certain if and/or when the County Attorney's office received Mr. Johnson's written request. As a result, the court finds and holds as a matter of law that Mr. Johnson did not properly invoke his right to a speedy trial [under the IAD]." Because the County Attorney's actual receipt of the request is at best speculative, we do not further address Appellant's "constructive notice" argument or its interplay with *Clutter's* strict compliance standard.

4. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

5. *See Washington v. Commonwealth,* 34 S.W.3d 376, 378–79 (Ky.2000) ("Challenging prospective jurors on the basis of race violates the Equal Protection Clause.")

*Commonwealth:* Well I just felt that *based upon her age* and obviously I went to school with her and I felt like ... I felt *more of the age than anything* and *based upon kind of my knowledge of her,* I felt like it was appropriate.

*Trial Court:* Your knowledge of her, having gone to and graduated from high school with her?

*Commonwealth:* Yeah, we just went to school together. *I just don't think she would be a good juror.*

*Trial Court:* Based on your personal knowledge of her?

*Commonwealth:* Just *based upon her friends and associates* and things like that I know of.

*Trial Court:* Alright, first of all, I do think it was necessary for you to give a reason. It's not proper in this court's opinion that for you to strike anybody based upon race alone.

*Commonwealth:* That wasn't the issue at all.

*Trial Court:* Right, I understand. And you've provided what I consider to be an acceptable explanation.

*Commonwealth:* I just think *based upon my knowledge of her friends, friends and associates years ago,* I just think it's too much of a wildcard.

In *Batson,* the United States Supreme Court prohibited deliberate racial discrimination during jury selection. The Supreme Court set forth a three-step process for trial courts to follow in adjudicating a claim that a peremptory challenge was based on race:

First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the

parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id.* at 97–98, 106 S.Ct. 1712. *Snyder v. Louisiana,* 552 U.S. 472, 476–477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008); *Miller–El v. Dretke,* 545 U.S. 231, 277, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (Thomas, J., dissenting); *Miller–El v. Cockrell,* 537 U.S. 322, 328–329, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *McPherson v. Commonwealth,* 171 S.W.3d 1, 3 (Ky.2005).

"[T]he trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court." *Chatman v. Commonwealth,* 241 S.W.3d 799, 804 (Ky.2007). " 'Deference,' of course, does not mean that the appellate court is powerless to provide independent review, *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (holding that the trial court's finding of non-discrimination was erroneous in light of clear and convincing evidence to the contrary), ... but the ultimate burden of showing unlawful discrimination rests with the challenger." *Rodgers v. Commonwealth,* 285 S.W.3d 740, 757–58 (Ky.2009). "A trial court's ruling on a *Batson* challenge will not be disturbed unless clearly erroneous." *Washington v. Commonwealth,* 34 S.W.3d 376, 380 (Ky.2000).

## A. Step–One of the Batson Test—The Prima Facie Showing of Racial Bias

Appellant made the requisite initial *prima facie* showing of racial discrimination necessary for a *Batson* challenge: (1) Appellant is African–American; (2) Juror Fourteen is African–American; and (3) the prosecutor struck Juror Fourteen from the jury pool. Nothing more is required to permit an inference of racial discrimina-

tion. *Blane v. Commonwealth,* 364 S.W.3d 140, 149 (Ky.2012).

## B. Step Two of the Batson Test—The Race–Neutral Reason for Striking a Juror

 The second prong of *Batson* requires the prosecutor to offer a race-neutral basis for challenging jurors in the protected class. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In spite of the lenient standards implied in these authorities, however, it is self-evident that, for this step of *Batson* to have any significance at all, the expressed basis for the strike must rise above the level of an inexplicable *excuse* and reach, at least, to the level of a coherent reason for the strike.

The Commonwealth's reasons for challenging Juror Fourteen fall into three categories: (1) *Age*—"well I just felt that based upon her age ... I felt more of the age than anything"; (2) *Personal Knowledge*—"based upon kind of my knowledge of her ... just based upon her friends and associates and things like that I know of ... based upon my knowledge of her friends, friends and associates years ago"; and (3) *Instinct or Gut Feeling*—"I just

don't think she would be a good juror ... I just think it's too much of a wildcard."

For the reasons explained below, we are unpersuaded that the reasons given by the prosecutor are sufficient to satisfy prong two of *Batson.*

### 1. Age

 Age may be a proper race-neutral reason to exercise a peremptory strike against a protected class. *Burkett v. State,* 230 Ga.App. 676, 497 S.E.2d 807, 809 (1998) ("[E]mployment, as well as age, are race-neutral explanations"). However, inherent in the notion that age may be an appropriate race-neutral *reason* for exercising a peremptory challenge against a member of a protected class, is that something more than the simple word itself, "age," is required to convert an excuse into a reason. While the distinction may be subtle, excuses are not equal to reasons, and here, all the Commonwealth offered as a race-neutral reason was the word, "age." *What* was it about the "age" of Juror Fourteen that concerned the prosecutor? No clue was provided to indicate how old she was and how her age was influencing the prosecutor's preference to have her removed from the jury. Was she too old or too young? Were other jurors of her age stricken? [6]

To satisfy step two of *Batson,* the prosecutor's neutral explanation must be clear and reasonable. *Alex v. Rayne Concrete Svc.,* 951 So.2d 138, 153 (La.2007). This is so because a clear, reasonably specific and legitimate *reason* is necessary for the trial court to fulfill its duty to assess the plausibility of the proffered reason for striking

---

**6.** To be clear, there certainly may be legitimate reasons that a party may seek jurors outside of this age range; for example in a civil case the plaintiff may be concerned that older jurors, reared in leaner times, are more averse to large verdicts; similarly in a criminal case where the victim is elderly, the Commonwealth may legitimately prefer an older jury more attuned to vulnerability that comes with age. Those situations, however, are easily distinguishable from the situation we address.

the potential juror in light of all the evidence; therefore, it is essential that the proponent of the peremptory strike fully articulate the reason so that a proper assessment can be made. *Id.* Here, the prosecutor, in identifying age as his principal rationale for the strike, failed in his duty to articulate a clear and reasonably specific *reason* for his strike.

### 2. The Prosecutor's Personal Knowledge

█ As a basis for striking Juror Fourteen the prosecutor also cited to his personal knowledge of her and her past associates from years ago ("based upon kind of my knowledge of her.... just based upon her friends and associates and things like that I know of ... based upon my knowledge of her friends, friends and associates years ago").

█ Of course, prosecutors may exercise peremptory challenges based upon their own personal knowledge concerning a juror, as well as from information supplied from outside sources. *Commonwealth v. Snodgrass,* 831 S.W.2d 176, 179 (Ky.1992). But, as we said in *Snodgrass,* "Whether the information is true or false is not the test. The test is whether the prosecutor has a good-faith belief in the information *and whether he can articulate the reason* to the trial court in a race-neutral manner which is not inviolate of the defendant's constitutional rights." (emphasis added).

Whatever the prosecutor knew about Juror Fourteen (and her friends and associates) that may have provided a race-neutral rationale for excluding her from the jury, remained known only to him. He never "articulate[d] the reason to the trial court[.]" *Id.* He failed to give a single, specific example of how his knowledge of the juror translated into a reason other than race to disfavor her participation as a juror.[7]

In summary, we conclude that the prosecutor's bare reference to his personal knowledge, as with his reliance upon "age," without the addition of some rationale to discern a non-racial motivation, does not satisfy prong two of the *Batson* test.

### 3. The Prosecutor's Instinct or Gut Feeling

█ Least impressive among the prosecutor's explanations for striking Juror Fourteen is his instinct, or gut feeling, which he expressed by saying, "I just don't think she would be a good juror.... I just think it's too much of a wildcard." Those statements, true as they may be, suffer from the same deficiency as his other efforts to circumvent the *Batson* challenge. The proffered statements are really no reason or explanation at all. Indeed, their very vagueness alone could fairly point toward a conclusion that they are merely pretextual. *See Toomer v. State,* 292 Ga. 49, 734 S.E.2d 333, 339 (2012) ("[t]he trial court may conclude that a vague explanation, or one that is in no way case-related, signals an unwillingness by the proponent to provide the real reason for the strike."); *see also Robinson v. U.S.,* 878 A.2d 1273 (D.C.2005) (finding prosecutor's statement that he "just didn't

---

**7.** The problem with accepting a naked assertion like, "my knowledge of her ... her friends and associates and things like that I know of" is that these type of statements would mask the same unconstitutional bias that Batson forbids if, and as a purely hypothetical example, all that the prosecutor knew about Juror Fourteen was that she was black and so were her friends. In other words, the simple expression, "based upon kind of my knowledge of her" does nothing to dispel the prima facie case that the strike is racially motivated.

like" the challenged juror, failed to furnish the required clear and reasonably specific explanation of a legitimate reason for striking that juror.); *People v. Carillo,* 9 A.D.3d 333, 780 N.Y.S.2d 143 (2004) (The prosecutor's use of peremptory challenge because he "just did not get a good feel from her," "amounted to, in essence, no explanation at all"); *Zakour v. UT Med. Grp., Inc.,* 215 S.W.3d 763, 774 (Tenn.2007) ("Although observations of a juror's body language may prompt a peremptory challenge ... in order to avoid a *Batson* violation, it is important that counsel specifically state the particular body language that forms the basis for a peremptory challenge.").

In addressing "gut feeling" explanations, the Louisiana Supreme Court agreed that such an explanation, standing alone, does not constitute a race-neutral explanation because it is ambiguous and "falls far short of an articulable reason that enables the trial judge to assess the plausibility of the proffered reason for striking a potential juror. Whatever is causing the 'gut feeling' should be explained for proper evaluation of the proffered reason." *Alex v. Rayne Concrete Svc.,* 951 So.2d at 153.

In similar fashion, the Louisiana Supreme Court held:

"Rubber stamp" approval of any nonracial explanation, no matter how whimsical or fanciful, would destroy [*Batson's* ] objective to ensure that no citizen is disqualified from jury service because of his race. "If trial courts were required to find any reason given not based on race satisfactory, only those who admitted point-blank that they excluded veniremen because of their race would be found in violation of the Fourteenth Amendment's guarantee of equal protection."

*Id.* at 154 (*quoting State v. Collier,* 553 So.2d 815 (La.1989)).

On this same point, the Supreme Court of South Carolina stated that to survive the "second stage of the *Batson* process" the proffered explanation:

need not be persuasive, or even plausible, *but it must be clear and reasonably specific such that the opponent of the challenge has a full and fair opportunity to demonstrate pretext in the reason given* and the trial court to fulfill its duty to assess the plausibility of the reason in light of all the evidence with a bearing on it.

*State v. Giles,* 407 S.C. 14, 754 S.E.2d 261, 265 (2014) (emphasis added).

■ Like age and personal knowledge, a trial lawyer's instinct or gut feeling can be the legitimate basis for a race-neutral reason to strike a juror of a protected class, but there must be some articulable, case-related reason attached to it. The explanation that Juror Fourteen was stricken from the venire upon the prosecutor's feeling that "I just don't think she would be a good juror ... I just think it's too much of a wildcard," lacks the clarity and reasonable specificity needed to satisfy step two of the *Batson* test.

For the foregoing reasons, we conclude that the Commonwealth failed to provide a cognizable race-neutral reason for striking Juror Fourteen, and therefore, has failed to satisfy the second prong of the *Batson* test. The trial court's acceptance of the explanations proffered by the Commonwealth was, therefore, unsupported by sound legal principles. Accordingly, the trial court's overruling of Appellant's *Batson* challenge and its acceptance of the explanations proffered by the Commonwealth was an abuse of discretion. *See Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) ("The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair,

or unsupported by sound legal principles.").

■ It is fundamental that a *Batson* violation is structural error not subject to harmless error review. *See Batson*, 476 U.S. at 100, 106 S.Ct. 1712 ("If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed.")[8] As such we are constrained to vacate Appellant's conviction and sentence and remand the case to Christian Circuit Court for a retrial of the charges under review.

### C. Step Three of the Batson Test— The Purposeful Discrimination Review

■ The final step under the test requires the trial court to assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine whether the proffered reasons are legitimate or simply pretextual for discrimination against the targeted class. However, because our review under step two of *Batson*, as explained above, is dispositive we need not further discuss the third step of the test.

### III. PENALTY PHASE STATEMENT BY PROSECUTOR

■ Finally, Appellant contends that he is entitled to a new sentencing phase

trial because during his penalty phase closing argument the prosecutor referred to him as "*a very violent person*" and claimed that "there's a lot of budgetary concerns going on in the state of Kentucky and [they] are letting [prisoners] out; there's a push to let out drug users and I would say the converse of that is *to lock up the people that we're actually scared of* and I would submit to you that Mr. Johnson is 100% a person society...."

■ Because we have vacated Appellant's conviction on other grounds we need not address this argument in detail, except to deter the repetition of improper argument upon retrial. A penalty phase characterization of a defendant in a terroristic threatening case as a "very violent person" may easily fall within the scope of proper argument provided it is supported by an evidentiary base. We caution, however, that a prosecutor may not "cajole or coerce a jury to reach a verdict." *Lycans v. Commonwealth*, 562 S.W.2d 303, 306 (Ky.1978); *See* also *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132–33 (Ky.2005) ("[W]e again caution the Commonwealth that it is not at liberty to place upon the jury the burden of doing what is necessary to protect the community.").

■ We also note that there was no evidence in the record regarding Ken-

**8.** *See also: Snyder v. Louisiana*, 552 U.S. 472, 486, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (Conviction reversed and remanded for a new trial "Because we find that the trial court committed clear error in overruling petitioner's Batson objection[.]"); *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998) ("Because the effects of racial discrimination during *voir dire* 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review.") (*quoting Powers v. Ohio*, 499 U.S. 400, 412, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Ford v. Norris*, 67 F.3d 162, 171 (8th Cir.1995) (holding that a "constitutional violation involving the selection of jurors in a racially discriminatory manner is a 'structural defect' ... which cannot be subjected to a harmless error analysis")); *Rosa v. Peters*, 36 F.3d 625, 634 n. 17 (7th Cir.1994) (holding harmless error analysis inappropriate in a *Batson/Powers* case); and *Ramseur v. Beyer*, 983 F.2d 1215, 1225 n.6 (3d Cir.1992) (en banc) ("[H]armless error analysis is inappropriate in cases involving discrimination in the jury selection process.").

tucky's "budgetary concerns" or the extent to which there is a "push to let out drug users," nor does it appear that such evidence would have had any relevance in this case, and these statements were therefore improper. While a prosecutor is granted wide leeway in closing arguments, he should not base his arguments on facts not contained in the record. *Garrett v. Commonwealth,* 48 S.W.3d 6, 16 (Ky.2001) (counsel, although allowed wide latitude during closing arguments to comment on the evidence and to draw reasonable inferences from it, "may not argue facts that are not in evidence or reasonably inferable from the evidence.").

### IV. CONCLUSION

In conclusion, we find that the trial court's decision to continue the trial did not violate the Interstate Agreement on Detainers, and was otherwise a proper exercise of the trial court's discretion. We further conclude that use of a peremptory challenge to remove Juror Fourteen was in violation of *Batson,* and therefore the judgment of the Christian Circuit Court must be vacated and the matter remanded for a new trial.

Minton, C.J., Abramson, Keller, Noble and Scott, JJ., concur. Cunningham, J., dissents by separate opinion.

CUNNINGHAM, J., DISSENTING:

I respectfully dissent. The majority correctly observes that "[u]nless a discriminatory intent is *inherent* in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (emphasis added). I don't believe such discriminatory intent is inherent here. *See also Commonwealth v. Snodgrass,* 831 S.W.2d 176, 179 (Ky.1992) ("*Batson* gives great deference to the trial court in determining whether the prosecutor's strike is racially motivated."). In the present case, the prosecutor had known the potential juror for years as well as her "friends and associates" and thought she would be a "wildcard." The prosecutor specifically articulated that she and the potential juror attended the same high school. It seems to me that these reasons satisfy *Batson.*