Cole Douglas ROSS, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2012–SC–000775–MR

Supreme Court of Kentucky.

RENDERED: FEBRUARY 19, 2015

COUNSEL FOR APPELLANT: Linda Roberts Horsman, Assistant Public Advocate, Frankfort

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, Heather Michelle Fryman, Assistant Attorney General

---

1. Ky. Const. § 110(2)(b).

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

A circuit court jury convicted Cole Douglas Ross of murder and first-degree arson for killing Keith Colston and burning down the trailer where he lived. The jury recommended a life sentence for each conviction to be served concurrently. The trial court accepted that recommendation and sentenced Ross accordingly. Ross appeals the resulting judgment as a matter of right.[1]

Ross raises five arguments on appeal. He claims the trial court erred by: (1) allowing the Commonwealth to use its peremptory challenges to strike female jurors over a *Batson* challenge; (2) admitting gruesome photographs of the victim's body depicting injuries he did not cause; (3) allowing the Commonwealth to admit a television purported to belong to Ross without first laying a proper foundation; (4) denying him access to exculpatory evidence contained in the psychotherapy records of witness Tonya Simmons, thereby limiting his ability to cross-examine her on those topics; and (5) rendering the trial fundamentally unfair due to cumulative error.

We conclude that the trial court erred in its application of *Batson* and impermissibly allowed the Commonwealth to use its peremptory challenges to dismiss jurors on the basis of gender. Because such an error is of constitutional and structural magnitude, we reverse Ross's convictions and remand for further proceedings. We analyze the remaining issues only insofar as they are likely to recur in the event of retrial.

## I. FACTUAL AND PROCEDURAL HISTORY.

Ross moved in with his friends Keith and Lisa Colston when he could no longer

afford to maintain his residence after losing his job. The Colstons lived in an improved singlewide trailer located in Melber, Kentucky, not far from Ross's former residence. The trailer's improvements included an addition on the back of the trailer that had its own outside entrance. This addition became Ross's room.

On the day of Keith Colston's death, Ross spent the morning running errands with his former girlfriend, Tonya Simmons, and her two grandchildren. They made multiple stops in Mayfield, Kentucky, and Paducah, Kentucky, with the latest receipt showing a purchase time of 11:15 a.m. Simmons then dropped off Ross at the Colstons' trailer.

According to Simmons, Ross then asked her to buy him beer. When she returned to the trailer with the beer, which was purchased at 12:54 p.m., she parked her vehicle and approached the separate entrance into Ross's room. On her way, she noticed the trunk to Ross's car was open and linens and other of Ross's belongings were packed inside. Upon reaching the backdoor, Simmons noticed a fire inside the trailer and heard Colston screaming for help. Ross pushed Simmons away from the door and assured her he would help Colston.

Allayed by Ross's reassurances, Simmons returned to the front of the trailer. She saw Ross reach out the front door, grab two full bottles of charcoal lighter fluid from the porch, and reenter the trailer. Colston's screams for help still echoed outside, and Simmons retreated to her car in a panic to call 911 and report the trailer fire. Simmons's report of the fire came in at 1:14 p.m. Ross then emerged from the trailer, got in his car, and left the scene before emergency responders arrived. Simmons followed suit and went to the hospital because she promised to pick up

her niece and sister following an outpatient procedure.

Ross's version of events is different. According to the statement Ross gave to investigators at the scene, after running errands he left the trailer to buy beer, and he did so at 1:41 p.m. He claims he had not seen Colston since eight or nine that morning, and did not find out about the fire until Lisa Colston called him. He then went to Lisa's grandmother's home to console Lisa and other family members because they had been informed of Colston's body found in the burnt remains of her trailer. Ross and Lisa later returned to the trailer to meet with investigators.

Simmons intended to contact police to explain what she witnessed at the Colstons' trailer following her niece's discharge from the hospital. But she was prevented from doing so by Ross, who appeared at Simmons's sister's house when Simmons was dropping her off. Ross followed Simmons for the rest of the day to ensure she did not contact police. Two days after the incident, the weight of what she had witnessed became too much for Simmons to handle, and she went to the hospital because of anxiety. Once there, she informed the doctor she had witnessed a murder and later gave her version of the events to the police.

Colston's body was found severely burnt, lying face up in the hallway of the trailer. It was explained at trial that this body position was inconsistent with death by smoke inhalation because most such victims are found positioned face down. The medical examiner also testified that the carbon monoxide level in Colston's body at the time of his death—14.8 percent—was too low to be fatal absent contributing circumstances. Arson investigators were able to obtain samples of the carpet and subfloor that were preserved from fire damage underneath Colston's

body. Three of the four samples tested positive for "medium petroleum distillates." Charcoal lighter fluid is one such accelerant considered a medium petroleum distillate. On the basis of this evidence, it was concluded that Colston burned to death.

Ross was indicted for murder and first-degree arson in the aftermath of the fire. His first trial in 2011 resulted in a mistrial because of a hung jury. At this, the second trial, the jury convicted Ross of all charges and recommended a life sentence for each crime, to be served concurrently. The trial court entered judgment consistent with this recommendation. This appeal involves only the second trial and the resulting judgment.

## II. ANALYSIS.

### A. The Trial Court Erred in its Application of *Batson*.

The Commonwealth used two of its nine peremptory challenges to strike African–American jurors, one male and one female. Ross invoked *Batson* and challenged those strikes as racially discriminatory. The Commonwealth justified the strike of the African–American male by explaining the Commonwealth had prosecuted his brother in the past and that there was another case then pending against the brother in which the juror was a victim and potential witness. As justification for striking the African–American female, in a moment of surprising candor and with his hand raised as if swearing an oath, the prosecutor stated: "In all honesty, I was striking wom-

en." The African–American female juror in question was immediately returned to the venire.

Ross then made another *Batson* motion, this time challenging the Commonwealth's use of peremptory challenges to strike female jurors. Seven of the Commonwealth's nine peremptory challenges were used to remove women from the venire. The Commonwealth's justification for these strikes ranged from a juror "waffling" to the prosecutor having previously represented the juror's ex-husband in their contentious divorce. After hearing the Commonwealth's justifications and Ross's responses, the trial court found the Commonwealth's proffered rationales to be gender neutral and nonpretextual. As a result, the trial court denied Ross's *Batson* motion. The struck females were dismissed from the panel, the jury was impaneled, and the trial began.

Ross challenges the denial of his gender-based *Batson* motion on appeal. He frames the issue as one of mixed justification where the Commonwealth has provided both permissible, gender-neutral rationales and impermissible, discriminatory justifications for the exercise of its peremptory challenges. This is an area rife with competing analyses for deciding *Batson* challenges when presented with both neutral and discriminatory justifications for the exercise of peremptory challenges. The competition between these alternative tests is underlined by a split between the federal circuit courts of appeal applying the mixed-motives analysis[2] and state courts favoring the "tainted" approach.[3]

---

2. *See, e.g., Gattis v. Snyder,* 278 F.3d 222, 242–35 (3d Cir.2002); *Wallace v. Morrison,* 87 F.3d 1271, 1274–75 (11th Cir.1996) (per curiam); *Jones v. Plaster,* 57 F.3d 417, 420–22 (4th Cir.1995); *United States v. Darden,* 70 F.3d 1507, 1530–32 (8th Cir.1995); *Howard v. Senkowski,* 986 F.2d 24, 27–30 (2d Cir.1993).

3. *State v. Lucas,* 199 Ariz. 366, 18 P.3d 160, 163 (Ariz.Ct.App.2001); *Rector v. State,* 213 Ga.App. 450, 444 S.E.2d 862, 865 (1994); *Payton v. Kearse,* 329 S.C. 51, 495 S.E.2d 205, 210 (1998); *Moore v. State,* 811 S.W.2d 197, 200 (Tex.App.1991); *State v. King,* 215 Wis.2d 295, 572 N.W.2d 530, 535 (Wis.App.1997).

That split is accentuated by a growing minority gaining a foothold among state courts and federal circuits alike and applying the substantial-part analysis.[4] Although this issue is one of first impression for this Court, our analysis does not require discussion of the mixed justification issue in order to resolve the issues raised by this case.

We find a fatal flaw in the trial court's *Batson* analysis at a juncture that precludes framing of this issue as one of dual motives. We find that the second prong of *Batson*—where the Commonwealth is required to provide a nondiscriminatory basis for its use of peremptory strikes—was not satisfied. Because we conclude that the Commonwealth did not meet its burden of offering a gender-neutral justification for its strikes, we cannot rightfully treat this as a mixed-justification case because there are not permissible and impermissible justifications to be weighed.

■■■■ The use of peremptory challenges to remove jurors from the venire on the basis of race or gender violates the Equal Protection Clause of the Constitution.[5] In *Batson v. Kentucky*,[6] the Supreme Court outlined the three-step process under which equal protection challenges to jury-selection practices would be determined.

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of [gender]. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a [gender]-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.[7]

[3, 4] A trial court's decision on a *Batson* challenge is given great deference on appellate review because the trial court's analysis will be based upon issues "peculiarly within the trial judge's province," [8] such as the "demeanor and credibility of the prosecutor." [9] This "[d]eference, of course, does not mean that the appellate court is powerless to provide independent review." [10] "A trial court's ruling on a *Batson* challenge will not be disturbed unless clearly erroneous." [11]

### 1. Prima Facie Showing of Gender Discrimination.

■■■■ The first step under the *Batson* analysis requires the party invoking *Bat-*

---

4. *Cook v. LaMarque*, 593 F.3d 810, 814–15 (9th Cir.2010); *State v. Ornelas*, 156 Idaho 727, 330 P.3d 1085, 1094–95 (App. 2014); *Khan v. State*, 213 Md.App. 554, 74 A.3d 844, 852 n.3 (2013) (discussing "substantial motivating factor" test favorably).

5. *Washington v. Commonwealth*, 34 S.W.3d 376, 378–79 (Ky.2000); *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); U.S. Const. amend XIV, § 1.

6. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

7. *Commonwealth v. Snodgrass*, 831 S.W.2d 176, 178 (Ky.1992) (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712) (citations omitted).

8. *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plu-

rality opinion) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

9. *Snodgrass*, 831 S.W.2d at 179; *Chatman v. Commonwealth* 241 S.W.3d 799, 804 (Ky. 2007) ("[T]he trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court.").

10. *Rodgers v. Commonwealth*, 285 S.W.3d 740, 757 (Ky.2009) (citing *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)).

11. *Washington*, 34 S.W.3d at 380.

*son* to make a prima facie showing that the peremptory challenges at issue were exercised on a discriminatory basis.[12] This does not require the movant to prove discrimination by a preponderance or more-likely-than-not standard.[13] "Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."[14]

Here, Ross's prima facie showing of gender discrimination was presented to him on a silver platter by the Commonwealth. The Commonwealth's candid admission that it was striking female jurors is sufficient to satisfy *Batson's* first step. This admission notwithstanding, the Commonwealth made statements during voir dire, which—when viewed in light of its disproportionate use of peremptory challenges against women—is sufficient to allow an inference of gender discrimination. During jury selection, the Commonwealth explained to the venire that its main witness was a woman and, ostensibly fearing a female juror's unfavorable view of her credibility, opined:

> I'm treading into really terrible territory here, so women don't get mad at me please. I am not sexist, I promise you, 'cause I've got, everything in my household is female. The cats, the fish, my daughter is one. Cat used to be male but is no longer, so he might as well be female. So, one of the main witnesses here is, uh, she is female. And I say this, because this is from experience, I believe from what I've seen, when it comes to things, testimony

and crimes and things of that nature. Women sometimes are harder on women. Now, let me explain that. And, again, I'm not trying to pump the men up here, either, because we've got our own faults. I have had rape cases, many of them over the years, and I've seen and I've heard questioning from women, "How did you get yourself in that circumstance?" You know, "How did this happen?"

Seven of the Commonwealth's nine peremptory strikes were used to remove those prospective jurors the Commonwealth was most worried about being "hard on" its star witness: women.

The trial court could reasonably infer a discriminatory intent behind the Commonwealth's challenged strikes; a prima facie case of gender discrimination was shown.

### 2. *Gender–Neutral Justification.*

 Once the defendant has made a prima facie showing of discrimination the burden shifts to the Commonwealth to provide a neutral, nondiscriminatory rationale for its use of peremptory challenges. At this stage, the proffered justification need not be convincing, nor "persuasive, or even plausible."[15]

 "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race or gender neutral."[16] Although the bar for a nondiscriminatory rationale to satisfy step two of the *Batson* analysis is set very low, "the expressed basis for the strike must rise above the level of an inexplicable *ex-*

---

12. *Snodgrass*, 831 S.W.2d at 178 (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712) (citations omitted).

13. *Johnson v. California*, 545 U.S. 162, 168–70, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).

14. *Id.* at 170, 125 S.Ct. 2410.

15. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

16. *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859.

*cuse* and reach, at least, to the level of a coherent reason for the strike." [17]

We need not delve into and analyze the sufficiency of the gender-neutral bases for all of the Commonwealth's challenged strikes because we find the reasoning given for two of the prospective female jurors to be insufficient to satisfy *Batson*'s second step. This conclusion is dispositive of the issue; and, therefore, we do not engage in a moot analysis of the remaining strikes.

Ms. G and Ms. C were the last two of the six female veniremembers subject to Ross's *Batson* challenge [18] to be provided with the gender-neutral justification for their strike. After the Commonwealth justified three of the four other prospective jurors' strikes with demeanor-based reasons, such as looking "amazed," "waffling," and not paying attention, as justification for striking Ms. G and Ms. C, the Commonwealth claimed that:

> [W]hat I actually wound up doing was kind of reversing it. I picked the jurors that I thought were the jurors that I liked, and it led me to some more names and she was one of the names. I might not have struck [them] otherwise.

Similar to the "prosecutor's instinct" justification we very recently discussed in *Johnson v. Commonwealth*, we find that the Commonwealth's "proffered statements are really no reason or explanation at all." [19] While the Commonwealth's jus-tification is not discriminatory on its face, that is because it provides no insight into the reasoning behind its strikes. Admittedly, it is often difficult to express the reason behind a strike—especially one that can fairly be called a "gut feeling"—but some affirmative attempt must be made to explain what caused the gut feeling.

▮ Justifications as vague as the Commonwealth's "I picked the jurors I liked and struck the rest" rationale, without more, are equally conducive to discriminatory selection of male jurors as those the Commonwealth "likes"—effectively shrouding the impermissible use of strikes as a vague strawman—as it is to the non-discriminatory justification that the Commonwealth preferred jurors having blue-collar backgrounds or a grasp of the relevant geographic area. [20] A justification rooted purely in what prospective jurors the Commonwealth likes or dislikes does nothing to dispel the specter of discrimination raised by the defendant's prima facie case of discrimination.

For a rationale that is subjective and internal to the prosecutor, *i.e.*, "I chose the jurors I liked and struck the rest," to satisfy the second prong of *Batson*, the rationale "must be clear and reasonably specific such that the opponent of the challenge has a full and fair opportunity to demonstrate pretext in the reason given

---

**17.** *Johnson v. Commonwealth*, 450 S.W.3d 696, 703 (Ky.2014).

**18.** The Commonwealth used its peremptory challenges to strike seven female jurors; but the seventh, the African–American woman whose strike was first challenged on racial grounds, had already been returned to the venire and was not subject to Ross's gender-based challenge.

**19.** *Johnson*, 450 S.W.3d at 704.

**20.** *See id.* at 704 n. 7 ("The problem with accepting a naked assertion like, 'my knowl-edge of her ... her friends and associates and things like that I know of' is that these type of statements would mask the same unconstitutional bias that [*Batson*] forbids if, and as a purely hypothetical example, all that the prosecutor knew about Juror Fourteen was that she was black and so were her friends. In other words, the simple expression, 'based upon kind of my knowledge of her' does nothing to dispel the prima facie case that the strike is racially motivated.") (alterations in original).

and the trial court to fulfill its duty to assess the plausibility of the reason in light of all the evidence." [21] Put differently, for the Commonwealth's justification in striking Ms. G and Ms. C to satisfy *Batson's* second prong, the prosecutor must articulate the paradigm of a juror he "likes," arid explain why the challenged jurors did not fit within it. [22] The Commonwealth did not do that in the present case.

We conclude that the Commonwealth's provided gender-neutral rationale for striking Ms. G and Ms. C was neither specific enough nor clear enough to provide Ross and the trial court the opportunity to challenge and weigh the reason as pretext. So the Commonwealth's proffered justification fails to satisfy *Batson's* second prong. As a result, the trial court's acceptance of, and ultimate reliance on, the Commonwealth's provided explanation is unsupported by sound legal principles, [23] rendering the trial court's denial of Ross's gender-based *Batson* challenge an abuse of discretion. [24] Because a *Batson* violation is constitutionally and structurally objectionable, we must reverse Ross's convictions and remand to the trial court for further proceedings. [25]

## B. The Trial Court did not Abuse its Discretion by Admitting Photographs of Keith Colston's Body.

█ During the firefighters' evacuation of the remains of the Colstons' trailer, Colston's body was injured, ripping the abdomen and exposing the intestines. This unfortunate injury was reflected in pictures introduced into evidence by the Commonwealth to accompany the testimony of the medical examiner and the arson investigator. Ross contends that the pictures showing Colston's exposed intestines are inadmissible because the injury causing their exposure was unrelated to the crime and cannot be attributed to him. [26] Ross claims that the inclusion of the intestines in the photographs served to incite the jury, thus, causing undue prejudice. [27]

█ The general "inclusionary thrust" of our rules of evidence renders all relevant evidence admissible unless excluded by evidentiary rule. [28] The most universally applicable and most important exclusionary rule is KRE 403, [29] which holds that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of undue preju-

---

**21.** *Id.* at 705 (quoting *State v. Giles*, 407 S.C. 14, 754 S.E.2d 261, 265 (2014) (emphasis omitted)).

**22.** *See id.* at 705 ("Whatever is causing the 'gut feeling' should be explained for proper evaluation of the proffered reason.") (quoting *Alex v. Rayne Concrete Serv.*, 951 So.2d 138, 153 (La.2007)).

**23.** *Id.* at 705–06.

**24.** *See, e.g., Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) ("The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.").

**25.** *Johnson*, 450 S.W.3d at 705–06 (citing *Batson*, 476 U.S. at 100, 106 S.Ct. 1712).

**26.** It is undisputed that the injury was caused by a firefighter's excavation hook.

**27.** *See* Kentucky Rules of Evidence (KRE) 403.

**28.** KRE 402; ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.05(2)(b) (5th ed. 2013) ("The inclusionary thrust of the law of evidence is powerful, unmistakable, and undeniable, one that strongly tilts outcomes toward admission of evidence rather than exclusion.").

**29.** LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.15(1) ("Rule 403 adopts and defines the most important of all of the exclusionary rules of the law of evidence....").

dice."[30] It is under this exclusionary rule that Ross claims the photographs containing Colston's exposed intestines are inadmissible.

> [I]n determining admissibility of evidence, it is necessary to make an assessment as to the probative worth of the evidence; to make an assessment as to the probable impact of the evidence (*i.e.,* undue prejudice); and to determine whether the probative worth is substantially outweighed by the undue prejudice of the evidence.[31]

The task of weighing the probative value and undue prejudice of proffered evidence is inherently factual and, therefore, within the discretion of the trial court.[32] A trial court's decision regarding the admissibility of evidence is reviewed for an abuse of discretion.[33]

■ "The general rule is that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous."[34] But "[t]his general rule loses considerable force when the condition of the body has been materially altered by mutilation, autopsy, decomposition or other extraneous causes, not related to the commission of the crime, so that the pictures tend to arouse passion and appall the viewer."[35]

The probative value of the admitted photographs is high because their introduction was aimed at showing more than identity of the victim and a depiction of the crime scene.[36] The photographs were introduced to prove integral portions of the Commonwealth's theory of the case. The Commonwealth asserted that Ross intentionally caused Colston's death by starting a fire in the trailer and then dousing Colston's body in lighter fluid, essentially causing him to burn to death. The body's position, lying face up, supports this theory as it tends to show that smoke inhalation was not the preeminent cause of death. Evidence adduced at trial shows that such victims are typically found lying face down. Further, the "drawing up" of Colston's arms and legs that can be seen in the photographs supports the medical examiner's testimony regarding the reaction of muscle tissue when exposed to extreme heat, again rendering the Commonwealth's theory of the case more likely. Lastly, the positioning of the body itself is probative because it provides a frame of reference for where the carpet and subfloor samples were taken and how they were preserved throughout the fire that ravaged the Colstons' home. The probative value of the photographs is significant.

Turning to the undue prejudice caused by the introduction of the photographs, that they are grotesque is clear. They depict the dead body of Keith Colston, charred nearly beyond recognition as a human corpse with the intestines protruding from his abdomen, lying on the floor among the charred debris that once constituted his home. It is likewise beyond cavil

---

**30.** KRE 403.

**31.** *Little v. Commonwealth,* 272 S.W.3d 180, 187 (Ky.2008).

**32.** *English,* 993 S.W.2d at 945 ("The balancing of the probative value of such evidence against the danger of undue prejudice is a task properly reserved for the sound discretion of the trial judge.").

**33.** *Little,* 272 S.W.3d at 187.

**34.** *Funk v. Commonwealth,* 842 S.W.2d 476, 479 (Ky.1992).

**35.** *Clark v. Commonwealth,* 833 S.W.2d 793, 794 (Ky.1991).

**36.** *Contra Holland v. Commonwealth,* 703 S.W.2d 876 (Ky.1985) (holding that pictures depicting the deceased's body that had been subject to animal mutilation were without significant probative value because they were not necessary to prove a contested fact).

that the photographs depict Colston's body in a materially altered condition that is extraneous from the crimes charged. But the exposure of the intestines does not substantially increase the offensiveness of the photographs, nor is it likely the intestines will cause the jury to act on emotion. As between the barely recognizable figure of Colston's charred body and the intestines protruding therefrom, the sight of the intestines is the least objectionable and provides a perverse respite from the more haunting portions of Colston's seared body. The prejudice caused by the exposure of Colston's intestines is relatively minimal.

The present case is also distinguishable from the decomposition-mutilation cases Ross cites as authority in arguing that the photographs are inadmissible. In the cases cited by Ross, the level of mutilation or decomposition the corpse suffered was significantly more severe and, thus, more gruesome than the isolated injury afflicted upon Colston's corpse.[37] The probative value of the photographs in those cases was also minimal or non-existant.[38] Here, as discussed above, the proffered photographs were of significant probative value and the undue prejudice caused by Colston's exposed organs was minimal. Further, the photographs deemed inadmissible

in the cases cited by Ross also appeared to be focused on the decomposition or mutilation, rendering the probative portions ancillary. Whereas, here, the injury to Colston's abdomen is not the focal point of the pictures offered into evidence by the Commonwealth; it is instead included only because it was inextricably intertwined with the purpose of the photographs.

We conclude that the trial court did not abuse its discretion in holding that the probative value of the photographs was not substantially outweighed by the danger of undue prejudice in admitting a limited number of photographs depicting Colston's exposed organs. To be clear, we simply conclude that the admission of the photographs was not an abuse of discretion given the circumstances of Ross's trial. On remand, the trial court is free to exercise its discretion regarding the admissibility of the photographs at future proceedings, especially if a change in circumstance mandates such.

## C. The Trial Court did not Abuse its Discretion by Concluding the Commonwealth had Laid a Sufficient Foundation for Admission of the Television.

Ross had his own flat-screen television in his bedroom while living in the Colstons'

---

37. *Funk,* 842 S.W.2d at 479 (pictures depicting trails and pools of body fluids "indicating the cadaver had been moved several times by dogs," and pictures of a larvae infestation of the deceased child's genital area); *Clark,* 833 S.W.2d at 794 (pictures depicting victim's decomposing face, victim's head with scalp and skull removed and a steel rod inserted inside, and a video depicting the discovery of the body seven months after the crime showing oozing "decompositional liquid" and red fluid covering the floor); *Craft v. Commonwealth,* 312 Ky. 700, 229 S.W.2d 465, 466 (1950) (a "ghastly" post-autopsy photograph depicting a shotgun wound that caused death, along with "a great many stitches taken under the neck of the deceased and down through the body").

38. *Funk,* 842 S.W.2d at 479 (the decomposition and infestation rendered the photos unable to assist the jury in resolving a contested issue); *Clark,* 833 S.W.2d at 795 (path of bullet could have been easily shown via x-ray without pictures of the mutilated skull, and video of the removal of the body from its concealed location "had no relevance ... but served only to arouse passion"); *Craft,* 229 S.W.2d at 466 (prejudicial post-autopsy picture lacked probative value and was irrelevant because the charged crime was burglary, a picture depicting the gruesome injury was not necessary to prove any element of the crime).

trailer. When the fire investigators arrived at the scene, the television was no longer in the home. Detective Jerry Jones later received a tip that Ross had pawned the television at a local pawn shop. Detective Jones recovered the television; and the Commonwealth introduced it as evidence, tending to show that Ross started the fire because he was able to spare his television from the destruction that befell the rest of the trailer.

Ross asserts the Commonwealth did not lay a proper evidentiary foundation to prove that the television introduced at trial was actually his and, if it were his, that it had not been altered or repaired as to vitiate any fire-related damage the television may have suffered. We review issues of evidentiary foundation for abuse of discretion.[39]

The foundational requirement for admission of real, tangible evidence is governed by KRE 901(a): "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[40] "Logically, a proper foundation requires the proponent to prove that the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission."[41] A stronger foundational showing is a prerequisite to admission of substances that are fungible and not as readily distinguishable; but it remains "unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification."[42] Instead, the proponent need only show that "the reasonable probability is that the evidence has not been altered in any material respect."[43]

Ross first claims that the Commonwealth provided an insufficient foundation to establish that the television entered into evidence was the same television Ross had in the Colstons' trailer. Evidence need not be collected by a testifying eyewitness to satisfy KRE 901(a).[44] Instead, identification of evidence may be accomplished "by linking it to the events in question by time, place, and circumstance."[45]

The Commonwealth presented evidence that Detective Jones collected the television from a pawn shop after having been informed that Ross pawned it. The presence of Ross's television at the pawn shop was corroborated by Tonya Simmons's testimony that she had accompanied Ross to the pawn shop to borrow money against his television after the fire. Lisa Colston also testified that, although she could not remember the brand of the television Ross had in her home, she thought the television presented by the Commonwealth was Ross's because of its size and shape and the distinctive DVD player built into the side of the television. In light of this evidence, we conclude the Commonwealth has sufficiently linked the television it of-

---

**39.** *Penman v. Commonwealth,* 194 S.W.3d 237, 245 (Ky.2006), *overruled on other grounds by Rose v. Commonwealth,* 322 S.W.3d 76 (Ky.2010).

**40.** KRE 901(a).

**41.** *Thomas v. Commonwealth,* 153 S.W.3d 772, 779 (Ky.2004).

**42.** *Rabovsky v. Commonwealth,* 973 S.W.2d 6, 8 (Ky.1998).

**43.** *Id.* (quoting *United States v. Cardenas,* 864 F.2d 1528, 1532 (10th Cir.1989)).

**44.** *Thomas,* 153 S.W.3d at 780 (citing *State v. Bohe,* 447 N.W.2d 277, 280 (N.D.1989)).

**45.** *Id.* at 780.

fered into evidence to Ross "by time, place, and circumstance" to support a finding that it was his television as the Commonwealth claims.

■ While Ross is correct that testimony from the owner of the pawn shop further linking the television to Ross would strengthen the Commonwealth's foundation and chain of custody, it is not necessary for admission of the television. KRE 901(a) does not require an impenetrable and unbroken chain of custody to allow admission of real evidence. "Any gaps [in the chain of custody] go to the weight, rather than the admissibility of the evidence." [46]

■ Ross next challenges the Commonwealth's evidence that the television was not materially altered between the trailer fire and its introduction at trial. He claims the Commonwealth put the television's condition into issue by arguing that because the television was not damaged or destroyed in the trailer fire, it tends to show Ross's intent to set the fire because he removed his belongings, including his television, from the trailer before it burned. Without persuasive proof that the television had not undergone repairs for fire-related damage, i.e., material alteration, Ross argues, the Commonwealth has failed to assure the integrity of the television, thus, rendering it inadmissible.

■ Real evidence is only admissible if there is a "reasonable probability that the evidence has not been altered in any mate-

rial respect since the time of the crime." [47] The difficulty of proving a negative aside, we believe the Commonwealth proffered sufficient evidence to allow the trial court to find there was a reasonable probability that the television was not repaired or materially altered between the fire and trial.

The Commonwealth produced persuasive evidence that Ross removed his television from the trailer before it burned. The Commonwealth produced evidence showing that Ross's television was not in the trailer when the investigators arrived on the scene. And, according to Simmons, she noticed Ross had packed some of his belongings into his car before the fire started. Although Simmons's testimony did not specifically mention the television packed in Ross's vehicle, she testified that Ross had the television in his possession following the fire.

■ Most importantly, however, is that Ross makes no affirmative allegations that the television had been subjected to damage, repair, or subject to tampering. "[S]peculation is not enough to destroy integrity." [48] There is no evidence to support a conclusion other than Ross removed his television from the trailer before the fire; and, therefore, the television would have no need to be materially altered to repair any fire damage.

This is not a case where no attempt is made to prove a chain of custody,[49] nor is it one where the real evidence cannot be connected to the crime in any regard.[50] In

---

46. *Id.* at 781.

47. *Id.* (quoting *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.1981)).

48. *Id.* at 782 (quoting *Brown v. Commonwealth*, 449 S.W.2d 738, 740 (Ky.1969)) (alteration omitted).

49. *Rabovsky*, 973 S.W.2d at 8 ("Here, however, there was no attempt at all to establish the

chain of custody of these blood samples....").

50. *Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 756 (Ky.2005) ("[N]o evidence, direct or circumstantial, competent or incompetent, identified the 9–mm pistol allegedly found in Appellant's vehicle nine days after the robbery as the pistol used in the robbery.").

this case, the Commonwealth provided a sufficient evidentiary foundation to allow the trial court to conclude that the television offered into evidence was the same television Ross possessed in the Colstons' trailer and that it was not materially altered between the fire and its introduction into evidence. So we conclude that the trial court did not abuse its discretion in finding that the Commonwealth laid a proper foundation for admission of the television into evidence. In the event of retrial, if the Commonwealth provides the same foundational evidence, the trial court should again allow admission of the television.

### D. The Trial Court Properly Limited Ross's Discovery of the Records of Simmons's Psychotherapy Treatment; his Right to Cross–Examine Simmons was not Denied.

 Lastly, Ross argues that the trial court improperly limited his access to Simmons's medical records, specifically those relevant to her use of Valium and treatment of any psychosis. Because of this limitation, Ross further argues he was denied his constitutional rights to cross-examination and to present a defense.

Before trial, Ross moved the court for discovery of Simmons's medical and mental health records pertaining to her psychological treatment and a KASPER[51] report outlining the medications prescribed to her in the ninety days before the fire and the six months following it. In re-

sponse to Ross's motion for discovery, the trial court reviewed the requested records in camera and concluded that Ross was entitled to discovery of only a small portion of the approximately three-hundred pages of Simmons's medical records produced to the trial court via subpoena for its in camera review.

In challenging the trial court's limitation on discovery and claiming that the trial court erred by impermissibly providing him with less discovery than he was entitled to, Ross stresses the importance of Simmons's credibility at trial. Both parties agree that Simmons was the Commonwealth's "star witness" and the only one whose testimony definitively places Ross at the crime scene with lighter fluid in his hands. Accordingly, Ross takes the position that information pertaining to Simmons's mental health and therapeutic use of prescription medication has a significant impact on Simmons's credibility at trial. He further notes that a witness's capacity to "observe, recollect, and narrate an occurrence is a proper subject of inquiry on cross-examination,"[52] and claims entitlement to Simmons's records that "contain evidence probative of [her] ability to recall, comprehend, and accurately relate the subject matter of the testimony."[53]

 Criminal defendants are entitled to compulsory process to obtain psychotherapy records of a crucial prosecution witness if those records contain exculpatory evidence, including evidence impacting

---

**51.** "The Kentucky All Schedule Prescription Electronic Reporting System (KASPER) tracks controlled substance prescriptions dispensed within the state. A KASPER report shows all scheduled prescriptions for an individual over a specified time period, the prescriber and the dispenser." *What is KASPER ?*, KY. CABINET FOR HEALTH AND FAMILY SERV.,

http://www.chfs.ky.gov/os/oig/KASPER.htm (last updated Feb. 12, 2015).

**52.** *Commonwealth v. Barroso* 122 S.W.3d 554, 562 (Ky.2003) (quoting *State v. Esposito*, 192 Conn. 166, 471 A.2d 949, 955 (1984)).

**53.** *Id.* at 563.

the witness's credibility such as deficiencies in the ability to observe, comprehend, recall, or express themselves.[54] To determine if a witness's psychotherapy records contain relevant exculpatory evidence, an "[in camera] review ... is authorized only upon receipt of evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence."[55] If discovery is denied following the in camera review, an appellate court "can review the records and determine whether the trial judge's ruling was an abuse of discretion."[56]

■ After review of the psychotherapy records included in the record under seal, we hold that the trial court did not abuse its discretion in concluding that the undiscovered portion of Simmons's records were not exculpatory.[57] We pause to note, however, that not every reference to psychological issues or. treatment is exculpatory and, thus, discoverable. In weighing whether psychotherapy evidence should be discovered "a court should consider ... the nature of the psychological problem, the temporal recency or remoteness of the condition, and whether the witness suffered from the condition at the time of the events to which she is to testify."[58] That is to say that evidence of hallucinations near in time to the subject of testimony is far more exculpatory than issues of anxiety or depression twenty years before.

■ Having concluded that the trial court did not err in its limitation of Ross's ability to discover Simmons's psychotherapy records, we must likewise conclude that Ross was not impermissibly denied his ability to cross-examine her or his ability to present a defense. The Constitution "guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense may wish.' "[59] Ross was provided with an opportunity to cross-examine Simmons effectively, and the trial court's proper limitation on discovery did not deny that. In fact, at trial, the Commonwealth asked Simmons about her use of Valium and her psychological health treatment. That Ross's opportunity to cross-examine Simmons was not as successful as he would have wished does not render the trial court's limitation on discovery erroneous, nor does it deprive Ross of his right to cross-examine Simmons and present a defense.

On remand, the trial court need not disclose further portions of Simmons's psychotherapy records that are currently under seal in the record and is not required to allow more expansive cross-examination in the event of retrial.

54. *Id.*

55. *Id.* at 564.

56. *Id.*

57. We note ·that the trial court ordered production of a KASPER report for in camera review, but no KASPER report was found in the sealed portion of the record containing Simmons's other psychotherapy records. Neither party directed us to any point in the record explaining the report's absence, ostensibly because neither party was privy to the contents of the documentation under seal.

Absent a compelling explanation for the absence of the KASPER report, on remand, the trial court is to obtain a copy and undertake an in camera review to determine if the report contains exculpatory evidence.

58. *Barroso,* 122 S.W.3d at 562–63 (quoting *People v. Anderson,* 25 Cal.4th 543, 106 Cal. Rptr.2d 575, 22 P.3d 347, 391 (2001)).

59. *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)); U.S. CONST. amend VI.

### III. CONCLUSION.

For the foregoing reasons, we conclude that the trial court abused its discretion in denying Ross's *Batson* challenge, thereby violating his right to due process and equal protection of the law. So we are constrained to reverse his convictions and remand the case to the trial court for a disposition consistent with this opinion.

Minton, C.J.; Abramson, Cunningham, Keller, Noble, and Venters, JJ., sitting. All concur.