# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.



Supreme Court of Kentucky

2014-SC-000332-MR

TERRENCE ALAN SIMS                                                  APPELLANT

               ON APPEAL FROM FAYETTE CIRCUIT COURT
V.              HONORABLE JAMES D. ISHMAEL, JR., JUDGE
                       NO. 13-CR-01023

COMMONWEALTH OF KENTUCKY                          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Appellant, Terrance Alan Sims, appeals from a judgment of the Fayette Circuit Court convicting him of murder and sentencing him to imprisonment for thirty-five years. Appellant raises the following arguments on appeal: (1) the trial court erred by denying his pretrial motion for self-defense immunity pursuant to KRS 503.085(1); (2) the trial court erred by denying his *Batson* challenge to the Commonwealth's peremptory strike of a juror; and (3) the trial court erred by limiting his cross-examination of a witness about the victim's criminal record. For the reasons stated below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Stephen Kavenaugh was shot and killed in downtown Lexington. Although Kavenaugh and Appellant apparently were not previously acquainted, they both ventured at the same time into the same part of town to buy crack cocaine, and then joined together to locate a dealer. Soon afterwards,

Kavenaugh's empty wallet was found next to his body. The contents of the wallet were scattered about, suggesting that he had been robbed. Laboratory testing of a shirt found nearby revealed the presence of Kavenaugh's blood. DNA, later identified as Appellant's, was also on the shirt.

Eventually, police located Appellant in Michigan and arranged to interrogate him about Kavenaugh's death. With the hope of inducing Appellant to speak more freely about the incident, police suggested to Appellant that Kavenaugh was known to them as a rough character, and a violent individual who robs people to "snatch[] the dope." They even suggested to Appellant, "You have the right to defend yourself against getting robbed." Although Appellant initially told police several different versions of the event, including denying that he was present at all, he eventually claimed that Kavenaugh attempted to grab a gun from Appellant's waistband; that a scuffle over the gun ensued; and that during the struggle, the gun discharged, killing Kavenaugh.

Appellant was indicted for the murder of Kavenaugh. Prior to trial, Appellant moved for dismissal of the case under the self-defense immunity provisions of KRS 503.085(1). His motion asserted that:

> The police report reveals no motive for this killing, and the witness statements in discovery indicate that Mr. Kavenaugh lunged for Mr. [Sims'] firearm and that the firearm was discharged as Mr. [Sims] attempted to wrestle it back from Mr. Kavenaugh in self-defense.

After conducting an evidentiary hearing on Appellant's motion, the trial court found from the evidence probable cause to believe that Appellant had not acted in self-defense, and so the motion to dismiss was denied.

2

At trial, Appellant persisted with his claim of self-defense, but the jury found to the contrary and returned a verdict convicting Appellant for the murder of Kavenaugh. The trial court entered judgment consistent with the verdict. After Appellant's motion for a new trial was denied, he filed this appeal.

## II. APPELLANT WAS NOT PREJUDICED BY THE TRIAL COURT'S METHOD OF RESOLVING APPELLANT'S SELF-DEFENSE IMMUNITY MOTION UNDER KRS 503.085(1)

Appellant first contends that the trial court erred to his prejudice in its handling of his motion to dismiss the charges pursuant to KRS 503.050 and KRS 503.085. Citing the procedures we outlined in *Rodgers v. Commonwealth*, 285 S.W.3d 740 (Ky. 2009) to guide trial courts in their resolution of motions for dismissal based upon self-defense immunity, Appellant contends that the trial court erred by basing its findings entirely upon the testimony of Det. Robert Wilson, the only witness to testify at the self-defense immunity hearing. Appellant argues that *Rodgers* mandated that the trial court's ruling must be based, in Appellant's words, on "materials and reports related to the case so as to make a neutral determination whether probable cause existed to believe the accused could be found guilty of murder."

More precisely, we said in *Rodgers* with respect to defendant's motion for immunity from prosecution based upon self-defense immunity: "The burden is on the Commonwealth to establish probable cause and it may do so by directing the court's attention to the evidence of record including witness

3

statements, investigative letters prepared by law enforcement officers, photographs and other documents of record." *Rodgers* at 755.

Appellant's complaint on appeal is not that the trial court misjudged the evidence by finding probable cause where none existed. Rather, his claim is that by conducting an evidentiary hearing instead of reviewing the paper record described in *Rodgers*, the trial court followed the wrong procedural route to resolve the self-defense immunity motion, and as a result, overlooked any compelling evidence that might have been found in the kind of materials described in *Rodgers*.

Significantly, Appellant fails to identify any instance in which he asked the trial court to follow the documentary review process detailed in *Rodgers*. Also, we find no indication that he objected to the trial court's use of an evidentiary hearing rather than a document review. We agree with the Commonwealth that this issue is not properly preserved. Therefore, our review of this issue is limited to the manifest injustice standard contained in RCr 10.26.

Upon review, we are persuaded that the record clearly demonstrates that probable cause existed to support the conclusion that Appellant's use of deadly force against Kavenaugh was unlawful. It would be nearly impossible to conclude otherwise, especially since a jury has determined beyond a reasonable doubt that Appellant did not act in self-defense, and since Appellant does not contend that the jury's verdict was not supported by

4

evidence sufficient to establish his guilt—a standard of proof far exceeding the reasonable doubt standard.

Given that probable cause is a very low evidentiary threshold, it is inconceivable that the trial court, after reviewing "evidence of record including witness statements, investigative letters prepared by law enforcement officers, photographs and other documents of record" as set forth in *Rodgers*, would have failed to find probable cause, which was so clearly established by the testimony of a single investigating police officer at the evidentiary hearing. If the process employed to determine whether probable cause existed to support the continuation of the prosecution after Appellant asserted self-defense was error, Appellant suffered no manifest injustice as a result.

## III. DENIAL OF BATSON CHALLENGE TO STRIKE OF JUROR 3053

Appellant contends that the Commonwealth's use of a peremptory challenge to remove Juror 3053 from the venire violated *Batson v. Kentucky*, 476 U.S. 79 (1986), and that the trial court erred by denying his objection to the Commonwealth's use of that challenge. The Commonwealth responded to Appellant's objection by proffering race-neutral reasons for its decision to strike the juror.

As we explained in *Johnson v. Commonwealth*, 450 S.W.3d 696 (Ky. 2014), *Batson* provides "a three-step process for trial courts to follow in adjudicating a claim that a peremptory challenge was based on race." Those steps are: 1) a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; 2) if that showing has been

made, the prosecution must offer a race-neutral basis for striking the juror in question; and 3) in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. *Id* at 702, citing *Batson*, 476 U.S. at 96.[1] "[T]he trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court." *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky. 2007). Ultimately, however, "[a] trial court's ruling on a *Batson* challenge will not be disturbed unless clearly erroneous." *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000).

Here, Appellant made the requisite *prima facie* showing of racial discrimination necessary for a *Batson* challenge: Appellant and Juror 3053 are both of African-American descent and the prosecutor used a peremptory challenge to remove Juror 3053 from the jury panel. Nothing more is required to permit an inference of racial discrimination. *Blane v. Commonwealth*, 364 S.W.3d 140, 149 (Ky. 2012).

The second prong of *Batson* requires the prosecutor to offer a race-neutral basis for challenging jurors in the protected class. The threshold is low. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Hernandez v. New York*, 500 U.S. 352, 360, (1991) (plurality opinion). "The

---

[1] *Johnson* actually cites the quoted passage from *Batson* as "476 U.S. at 97-98," which is incorrect. The correct citation is 476 U.S. 96.

second step of this process does not demand an explanation that is persuasive, or even plausible," *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995), though "the expressed basis for the strike must rise above the level of an inexplicable excuse and reach, at least, to the level of a coherent reason for the strike." *Johnson* at 703. Here, the prosecutor cited the fact that Juror 3053 had tattoos, body piercings, suffered from chronic pains, and had an "attitude." Since none of those factors are exclusive to African-Americans, and they rise above the level of "inexplicable excuse" as held in *Johnson*, we have no difficulty accepting it as a racially-neutral basis for challenging the juror.

The final step of the *Batson* test requires the trial court "to assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine whether the proffered reasons are legitimate or simply a pretext for discrimination against the targeted class." *Johnson*, 450 S.W.3d at 706. As noted above, the trial court's ultimate decision on this point is given deference as a finding of fact, and so we review it under the clearly erroneous standard. A finding of fact is clearly erroneous if it is not supported by substantial evidence, which is defined as evidence "which has sufficient probative value to induce conviction in the mind of a reasonable person." *Hunter v. Hunter*, 127 S.W.3d 656, 659 (Ky. App. 2003).

During jury selection, the Commonwealth issued peremptory challenges against eight venire members. One of the prosecutors at the trial made notations on the strike sheet to explain each peremptory challenge. For Juror 3053, the prosecutor wrote: "Chronic back pain. Tatoos/piercings—unclear on

7

her status as Army. Doesn't appear consistent w/military standards. Attitude." In the discussion at the bench concerning Juror 3053, the trial court expressed some reservations about the Commonwealth's basis for excluding Juror 3053, and asked the Commonwealth to clarify the reference to her "attitude." The prosecutor replied that she believed Juror 3053 had somewhat of a strange demeanor when she came to the bench; that the piercings and the tattoos had nothing to do with race, and that prosecution had also used a peremptory strike to remove another juror with facial jewelry and who also had a friend in jail for trafficking marijuana. Ultimately, the trial court accepted the Commonwealth's reasons as being race-neutral and not pretextual. Appellant's *Batson* challenge was denied.

Upon review we are constrained to conclude that there is a substantial basis to support the trial court's finding. Under the deferential standard outlined above, we cannot say the trial court's ruling was clearly erroneous. We are not persuaded that the trial court erred in upholding the Commonwealth's peremptory strike of Juror 3053.

## IV. EXCLUSION OF VICTIM'S PRIOR ROBBERY CONVICTION

Detective Matthew Brotherton, one of the police officers who first interviewed Appellant after he was located in Michigan, testified at trial. After a recording of Appellant's police interview was played for the jury, the prosecution questioned Brotherton about the statements officers made to Appellant during the interview, including the derogatory statements used to suggest that Kavenaugh was dangerous. Brotherton acknowledged that the

8

officers employed those statements intentionally to deceive Appellant about Kavenaugh's past in the hope of inducing Appellant to admit his involvement in the shooting. Brotherton explained this as an interview technique occasionally employed as a means of getting information or a confession from a suspect. Brotherton also testified that the statements made to Appellant about Kavenaugh's violent past, which the jury heard when the recording was introduced, were *not* true. Appellant characterized this testimony as an effort to cast the victim in a more favorable light, as a non-violent person, in order to undermine Appellant's claim of self-defense.

Appellant's counsel tried to cross-examine Brotherton about Kavenaugh's criminal record for the purpose of refuting whatever misimpression that Brotherton's testimony may have created respecting Kavenaugh's character. Apparently, Kavenaugh had a prior conviction for second-degree robbery. The trial court sustained the Commonwealth's objection to that line of cross-examination on the grounds that police were using a legitimate interrogation technique and were allowed to lie to suspects during police interrogation.[2] The trial court hinted that he might allow a broader inquiry into the issue of Kavenaugh's criminal past when Brotherton's partner, Detective Wilson, took the stand; however, Wilson was never called as a witness.

---

[2] The use of a ruse, or "strategic deception," does not render a defendant's statement involuntary so long as the ploy does not rise to the level of compulsion or coercion. *See Illinois v. Perkins*, 496 U.S. 292 (1990).

This evidentiary ruling was also the subject of Appellant's post-trial motion for a new trial, in which he distilled the issue as follows:

> Mr. Sims was not granted a fair trial due to the improper bolstering of Steven Kavenaugh's character through Detectives Brotherton and Wilson during the recorded interview which was played for the jury. Additionally, Mr. Sims was not given an opportunity to disprove the statements made by those detectives, so the jurors were made to believe that Mr. Kavenaugh was not previously convicted of robbery. Attached is documentation that Mr. Kavenaugh was in fact convicted of robbery.

Appellant argues on appeal that his cross-examination of Brotherton should not have been curtailed as it was, and that he should have been allowed to introduce proof of Kavenaugh's prior conviction for second-degree robbery.[3] He argues that the Commonwealth "opened the door" to the evidence when it presented Brotherton's testimony re-casting Kavenaugh's disposition as that of a non-violent person to dispel the negative impression created about him when the jury heard contrary statements made by the police on the interview recording.

---

[3] The record discloses that in 1997 Kavanaugh, as a result of a plea agreement, was convicted of second-degree robbery (as amended down from the original charge of first-degree robbery); and receiving stolen property over $300.00. In connection with the plea agreement charges for carrying a concealed deadly weapon and third-degree criminal mischief were dismissed. The original charge, first-degree robbery, is classified as a violent offense under KRS 439.3401(m), though second-degree robbery is not similarly classified under the violent offender statute. Nevertheless, KRS 515.030 describes the elements of second-degree robbery, a Class C felony, as follows: "A person is guilty of robbery in the second degree when, in the course of committing theft, *he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft.*" (emphasis added). As such, while second-degree robbery may not formerly be classified as a "violent offense" under the violent offender statute, second-degree robbery has elements of violence associated with it (actual or threatened use of physical force).

10

"The term 'opening the door' describes what happens when one party introduces evidence and another introduces counterproof to refute or contradict the initial evidence . . . If the first party objects to the counterproof, or loses the case and claims error in admitting it, typically the objection or claim of error is rejected because he 'opened the door.'" ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 1.10[5] (4th ed. 2011) (quoting 1 Mueller & Kirkpatrick, Federal Evidence, § 12 (2d ed. 1994)). Sometimes referred to as "curative admissibility," opening the door occurs when one party introduces an inadmissible fact that opens the door for the opponent to offer similar facts whose only claim to admission is that they negate, explain, or counterbalance the prior inadmissible fact. *Norris v. Commonwealth*, 89 S.W.3d 411, 414 (Ky. 2002).

We addressed virtually the same circumstances very recently in *Stansbury v. Commonwealth*, 454 S.W.3d 293, 300-01 (Ky. 2015), although in that case the Commonwealth was on the opposite side of the issue:

> []Stansbury . . . elicited testimony from Falconer about the extent to which he cared for her pets, testimony that could have been excluded as inadmissible character evidence. However, as we held in *Metcalf* [*v. Commonwealth*, 158 S.W.3d 740 (Ky. 2005)], once Stansbury opened the door to the introduction of "good" character evidence, he cannot complain if the Commonwealth walked through that door and introduced character evidence not to his liking. Therefore, we hold no error occurred.

With reference to *Commonwealth v. Higgs*, 59 S.W.3d 886, 894 (Ky. 2001), we noted in *Stansbury* that "testimony by Higgs's father that Higgs was not a thief

11

'opened the door' to evidence that Higgs's father had accused Higgs of stealing property from him."

We agree with Appellant. Although evidence that Kavenaugh had been convicted of a violent crime might otherwise have been inadmissible under KRE 404(b), once the Commonwealth introduced testimony that Kavenaugh did not have a violent criminal record, the door was opened for Appellant to offer proof to the contrary. To paraphrase *Higgs, supra,* testimony by Brotherton that Kavenaugh was not a robber or a violent person, "opened the door" to Appellant's evidence that Kavenaugh was a convicted robber. The rule invoked to the Commonwealth's advantage in *Stansbury* and *Higgs* applies to the defendant as well. The trial court erred by limiting Appellant's cross-examination of Brotherton on this point.

Nevertheless, we find the error to be harmless. The evidence of Appellant's guilt was overwhelming. There was no doubt at all that his gun fired the fatal bullet and that Kavenaugh's blood was on Appellant's shirt, which he apparently discarded at the scene. Circumstances indicated that the same person that shot Kavenaugh also robbed him, or attempted to rob him, as evidenced by the ransacking of the victim's wallet and the fact that people in the vicinity, upon hearing the gun shot, arrived on the scene almost immediately. Appellant's flight from the area suggests consciousness of guilt; forensic evidence discredited the manner in which Appellant claimed the fatal wound was inflicted; Appellant and Kavenaugh were both involved in the nefarious activity of buying illegal drugs; and after being located in Michigan

12

and questioned by police, Appellant gave conflicting accounts of the incident, further evincing a consciousness of guilt. Moreover, Kavenaugh's robbery conviction was thirteen years prior to this event, and thus did not demonstrate *recent* violent conduct, thereby mitigating its significance in light of the other proof. The jury was made aware of the victim's recent drug use and, in our view, was not likely to have been unduly sympathetic to the victim, such that the Appellant was unfairly prejudiced. We find it unlikely that the Commonwealth's misleading, and conflicting, portrayals of the victim, first in the interview with Appellant and then in Brotherton's testimony, led the jury to reject Appellant's self-defense theory.

In summary, although we are satisfied that the trial court's ruling constraining Appellant's ability to cross-examine Brotherton about the victim's robbery conviction was erroneous, we are satisfied that it did not substantially sway the jury's verdict and sentencing recommendation. Looking at totality of evidence heard by the jury in this case, we conclude with fair assurance that the error did not substantially sway the verdict, and so was harmless. *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009).

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

All sitting. Minton, C.J., Barber, Cunningham, Keller, Noble, and Venters, JJ., concur. Abramson, J., concurs in result only.

13

COUNSEL FOR APPELLANT:

Linda Roberts Horsman
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General
Office of the Attorney General