RENDERED: JUNE 25, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0336-MR

CORNELIUS BASKIN                                                APPELLANT

V.

ON APPEAL FROM WARREN CIRCUIT COURT
HONORABLE JOHN R. GRISE, JUDGE
NO. 23-CR-00714

COMMONWEALTH OF KENTUCKY                           APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>REVERSING AND REMANDING</u>**

Cornelius Baskin was found guilty of first-degree aggravated trafficking in a controlled substance (first offense, fentanyl), first-degree trafficking in a controlled substance (first offense, methamphetamine), possession of drug paraphernalia, alcohol intoxication in a public place, and being a first-degree persistent felony offender. The trial court sentenced Baskin to twenty-five years' imprisonment. Baskin now appeals as a matter of right. KY. CONST. § 110(2)(b). We hold that the trial court erred in ruling that the Commonwealth offered sufficient reasons to overcome Baskin's *Batson* challenge. Thus, we reverse the judgment of the court, and this matter is remanded for further proceedings and retrial. We will, however, address all claims raised by Baskin

as they are likely to recur at trial.  *See Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000).

## I.  Background

On April 27, 2023, officers received a 911 call reporting a disturbance on West Main Avenue in Bowling Green.  When officers arrived at the scene, Baskin was standing outside a parked black vehicle.[1] She informed officers that Baskin had sexually assaulted her, and officers questioned Baskin at the scene. Officers could tell that Baskin was obviously intoxicated. Officers made the decision to arrest Baskin for alcohol intoxication while they investigated Welman's sexual assault claim.  Baskin was found with condoms and $1,014 in cash on him. Officers obtained a search warrant for the vehicle to look for evidence of the sexual assault.

Upon searching this vehicle, officers found a bag with a half-empty bottle of vodka, clothes, and several court documents with Baskin's name, address, date of birth, and driver's license number.  In the bag, officers also found a Ziploc bag that contained crystallized methamphetamine.  The Ziploc bag also contained a pill bottle holding yellow pills.  Furthermore, the Ziploc bag contained a smaller plastic bag holding approximately 835 pills.  Some pills were blue, others were blue-green.  Officers also found digital scales in the center console.  Subsequently, two of each of the blue and blue-green pills were sent to the lab for testing.  The lab tested one of each pill.  The blue pill tested

---

[1] Lakesha Hewitt owned the vehicle. Her relationship to Baskin is unclear from the record.

positive for fentanyl, and the blue-green pill tested positive for both fentanyl and methamphetamine.

A grand jury returned an indictment on first-degree trafficking in a controlled substance (first offense, fentanyl), first-degree trafficking in a controlled substance (first offense, methamphetamine), possession of drug paraphernalia, illegal possession of a legend drug, alcohol intoxication in a public place, and being a first-degree persistent felony offender.[2]

A jury found Baskin guilty of first-degree aggravated trafficking in a controlled substance (first substance, fentanyl), first-degree trafficking in a controlled substance (first offense, methamphetamine), possession of drug paraphernalia, alcohol intoxication in a public place, and being a first-degree persistent felony offender. The jury recommended twenty-five years' imprisonment. The trial court sentenced Baskin in accordance with the jury's recommendation. Baskin now files this appeal.

## II.    Analysis

On appeal, Baskin argues the following: he was entitled to a directed verdict on aggravated trafficking in fentanyl greater than twenty-eight ounces; the trial court violated *Batson v. Kentucky*, 476 U.S. 79 (1986) by finding the Commonwealth's unverified information from an outside source was a race neutral reason and failing to evaluate whether it was pretext; Baskin was prejudiced by the extensive and irrelevant video evidence concerning an

---

[2] Baskin was not charged in connection with Welman's allegations. Therefore, evidence of said allegations was not presented to the jury.

3

investigation for an unrelated offense, and by the Commonwealth's use of that evidence in closing arguments; and Baskin was prejudiced by Detective Grimsby's un-noticed expert testimony that he believed that crystal flakes on the passenger seat of the vehicle were methamphetamine and that Welman was high on it.

## A. The trial court erred in ruling that the Commonwealth proffered sufficient reasons to overcome the *Batson* challenge.

Baskin contends that the trial court erred when overruling his *Batson* challenge to the Commonwealth's use of a peremptory challenge to strike Juror 545. This issue is preserved for appeal because Baskin made a *Batson* challenge regarding Juror 545, and the trial court overruled it. *See Bell v. Commonwealth*, 473 S.W.2d 820 (Ky. 1971).

"Challenging prospective jurors on the basis of race violates the Equal Protection Clause." *Washington*, 34 S.W.3d at 378–79. "[A] Batson violation is structural error not subject to harmless error review." *Johnson v. Commonwealth*, 450 S.W.3d 696, 706 (Ky. 2014), (*abrogated on other grounds by*, *Roe v. Commonwealth*, 493 S.W.3d 814 (Ky. 2015). "In *Batson*, the United States Supreme Court set out a three-step process for trial courts to follow in adjudicating a claim that a peremptory challenge was based on race." *Roe*, 493 S.W.3d at 827.

Under the first prong, "a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Id.* To make a prima facie showing, the defendant need only show that the excluded

juror is "a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove" the juror. *Id.*

The trial court implicitly determined that Baskin established a prima facie case of discrimination by proceeding to the second prong of *Batson* before denying the *Batson* challenge. The record supports this determination, and we likewise conclude that Baskin satisfied the prima facie requirement. Here, Juror 545 is Black, and the Commonwealth struck Juror 545 from the jury pool. *See Johnson*, 450 S.W.3d at 702. We have held that there does not need to be a racial identity between the defendant and the excluded juror. *Roe*, 493 S.W.3d at 828. However, we find it relevant to mention that Baskin is also Black. Based on these facts, "[n]othing more is required to permit an inference of racial discrimination." *Id.* (citing *Blane v. Commonwealth*, 364 S.W.3d 140, 149 (Ky. 2012)). We will now proceed to *Batson's* second prong.

"The second prong of *Batson* requires the prosecutor to provide a race-neutral explanation for striking a juror of a protected class." *Roe*, 493 S.W.3d at 827 (citing *Johnson*, 450 S.W.3d at 702).

> [I]f the requisite showing has been made, the burden shifts to the Commonwealth to articulate clear and reasonably specific race-neutral reasons for its use of a peremptory challenge. While the reasons need not rise to the level justifying a challenge for cause, self-serving explanations based on intuition or disclaimers of discriminatory motive are insufficient.

*Washington*, 34 S.W.3d at 379 (internal quotation marks omitted) (quoting *Stanford v. Commonwealth*, 793 S.W.2d 112, 114 (Ky. 1990)). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation."

5

*Hernandez v. New York*, 500 U.S. 352, 360 (1991). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Roe*, 493 S.W.3d at 827 (citing *Hernandez*, 500 U.S. at 360). "[A] trial lawyer's instinct or gut feeling can be the legitimate basis for a race-neutral reason to strike a juror of a protected class, but there must be some articulable, case-related reason attached to it." *Roe*, 493 S.W.3d at 827 (citing *Johnson*, 50 S.W.3d at 705).

The Commonwealth provided two reasons for striking Juror 545. The first proffered reason was based on information the Commonwealth received from other attorneys prior to trial:

> Judge, she was nodding her head whenever I asked questions about police or the system being broken, and she didn't elaborate. In preparation for this trial, I spoke with other attorneys who have had the same jury. It was relayed to me that she articulated in a previous voir dire that she did believe the system was broken—that she had issues with the system being as it was. I couldn't draw a response out of her. I asked her . . . a very similar question. I was told in her previous voir dire; she has issues with the police and their treatment.

The Commonwealth also asserted that Juror 545 was inattentive and seemed disinterested during voir dire.

The court accepted the Commonwealth's explanation that, prior to trial, he had spoken with other attorneys who had interviewed the same jury panel, and Juror 545 said she believed the criminal justice system was broken and had issues with the system and police. The trial court also found that while the Commonwealth's reason was not sufficient to strike a juror for cause, it was a sufficient reason to use a peremptory strike. The trial court rejected the

6

Commonwealth's demeanor argument. We agree with the trial court that Juror 545's voir dire responses in a previous case constitute a facially race-neutral reason. A juror's expression of possible defense bias is coherent and related to the case, even if the explanation is not persuasive or plausible. *See Johnson,* 450 S.W.3d at 703. Thus, we will proceed to *Batson's* third prong.

"The final prong of the *Batson* test requires the trial court to assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine if the proffered reasons are simply pretexts for discrimination." *Id.* "The trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court, and so will not be disturbed unless clearly erroneous." *Id.* (quoting *Washington,* 34 S.W.3d at 380) (internal quotation marks omitted).

> [T]he trial court has the duty to evaluate the credibility of the preferred reasons and determine if the defendant has established purposeful discrimination. A judge cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact. In order to permit the questioned challenge, the trial judge must conclude that the proffered reasons are, first, neutral and reasonable, and second, not a pretext. These two requirements are necessary to demonstrate "clear and reasonably specific . . . legitimate reasons."

*Washington,* 34 S.W.3d at 379 (internal citations omitted). We agree with the trial court that juror research is permissible. However, in light of all relevant evidence, we hold that the Commonwealth's reasons are pretexts for discrimination. *Id.*

The following interaction between the Commonwealth and jurors was the basis for Baskin's *Batson* challenge.

7

**Commonwealth:** Who here has heard the term "the criminal justice system is broken"?

**Juror 661:** Look at what is happening to President Trump. That should answer it.

**Commonwealth:** Okay.

**Juror 702:** The Breonna Taylor case.

**Commonwealth:** The Breonna Taylor case. Can you tell me a bit more about that?

**Juror 702:** At the time, there was questions about the officers coming to the right house and had an overuse of force in that situation. And there were accusations about the criminal justice system in that situation.

**Commonwealth:** Knowing what you know about the incident from what you have told me, would you be able to sit through this trial knowing that I am a prosecutor; knowing that evidence is going to be put on by law enforcement. Can you still give this side a fair chance?

. . . [not audible]

**Juror 702:** Yes, sir.

**Commonwealth:** Yes, ma'am. You in the back raised your hand as well concerning the criminal justice system being broken.

**Juror 545:** I just heard the term.

**Commonwealth:** You just heard the term?

**Juror 545:** Yeah.

**Commonwealth:** Do you have any opinions on the term?

**Juror 545:** No.

**Commonwealth:** One way or the other?

**Juror 545:**        No.

Juror 545 was Black, and Jurors 661 and 702 were white. The Commonwealth used peremptory strikes on Juror 545 and Juror 702. However, the Commonwealth did not strike Juror 661, and Juror 661 ultimately served on the jury. Notably, Juror 661 was not asked to further explain his statements, despite expressing genuine concerns that the justice system was broken. Instead, the Commonwealth simply moved on without inquiry. In contrast, when Juror 702 referenced knowing the phrase as being associated with the death of Breonna Taylor—a Black woman—the Commonwealth engaged in additional questioning regarding whether he could remain impartial. Although Juror 702 affirmed that he could be fair, the Commonwealth nevertheless exercised a peremptory strike. Similarly, Juror 545—a Black woman—stated only that she had heard the phrase. She was subjected to further questioning and clarified that she held no opinions about it. Despite this, the Commonwealth struck her as well. Thus, the only juror who expressed a concrete concern about the justice system—Juror 661—was not struck and remained on the jury.

Concerningly, the Commonwealth has not provided any more information or evidence that the basis for striking Juror 545 was based on provable facts. When the trial court asked the Commonwealth to identify which case Juror 545 was previously a member of a venire panel, the prosecutor appeared uncertain. The prosecutor looked to co-counsel and then to defense counsel, asking, "Freeman?" Co-counsel did not respond, and defense counsel

9

indicated that he did not know, noting that jurors enter each voir dire without reference to prior proceedings. The Commonwealth stated: "I don't want to . . . misspeak on the record exactly what she said but in preparing for trial, those were the notes that were given to me."

The trial court then stated: "Well, it better be right." No further information was given on Juror 545's alleged statements in a different voir dire proceeding. The trial court then expressed significant concern, emphasizing that Juror 545 had merely stated that she *heard* the phrase that the system was broken. The court noted that nothing in her response suggested that she held any personal belief or bias against the justice system, nor did her statement provide a basis to infer partiality.

Even though the proffered reason was facially coherent and race-neutral, because it was unsupported by information from the prior case or Juror 545's responses in this case, it is indicative of pretext. In *Washington*, this Court stated concerns regarding a similar issue.

> Finally, the Commonwealth's third proffered reason, namely that Mr. Newberry had previously served on a jury that returned an acquittal verdict may have been a sufficient race-neutral explanation. However, the Commonwealth provided nothing other than a bare assertion during the bench conference, and the trial judge accordingly rejected the reason. The Commonwealth was unable to provide the trial court any details of Mr. Newberry's prior jury service until it filed the Commonwealth's response to the motion for new trial some six weeks later.

*Id.* (internal citations omitted).

Here, the Commonwealth stated that it could find the specific case it was referencing; however, there is nothing in the record to indicate that the

10

Commonwealth did so. On appeal, the Commonwealth merely restates that the prosecutor believed the case was Freeman. As noted by the trial court, the Commonwealth failed to question Juror 545 in a manner that elicited relevant information from her regarding this matter. Thus, we hold that the proffered reason was indicative of pretext.

In *Flowers v. Mississippi*, the United States Supreme Court held that certain facts considered together indicate discriminatory intent. 588 U.S. 284, 285–86 (2019).

> Here, Carolyn Wright, a black prospective juror, was struck, the State says, in part because she knew several defense witnesses and had worked at Wal-Mart where Flowers' father also worked. But three white prospective jurors also knew many individuals involved in the case, and the State asked them no individual questions about their connections to witnesses. White prospective jurors also had relationships with members of Flowers' family, but the State did not ask them follow-up questions in order to explore the depth of those relationships. The State also incorrectly explained that it exercised a peremptory strike against Wright because she had worked with one of Flowers' sisters and made apparently incorrect statements to justify the strikes of other black prospective jurors. When considered with other evidence, a series of factually inaccurate explanations for striking black prospective jurors can be another clue showing discriminatory intent. The overall context here requires skepticism of the State's strike of Carolyn Wright. The trial court at Flowers' sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not motivated in substantial part by discriminatory intent.

The facts in Baskin's case resemble those in *Flowers*. The Commonwealth proceeded to argue another race-neutral reason for striking Juror 545.

> That is not the only reason. Again, I was troubled by her acknowledgment of the statement; I could not get anything else out. Also, the observations of both me and the others with my table during the entirety of the voir dire process was that she was

11

not especially attentive; that she was not especially interested; and that she would not make a good juror for these reasons.

However, the trial court firmly rejected this argument:

> Well, I am not ruling on that basis because I did not see that, and I was watching her. In these types of things, I watch the jurors that are likely to have a *Batson* challenge. And so, I did not see her as inattentive. I felt her to be more attentive than half of the white people on the jury. Number one. And number two, you did not ask a question to get more out of her. . . . Your only question was, "Has anyone ever heard the system was broken," and several people—several people—nodded including her. And then you said, "Can you elaborate on that," and there is nothing for her to elaborate on. She said, "Well I have heard of it. I am telling you I have heard of it." But she did not elaborate on it; she did not adopt that belief. She did not give an affirmation that she believed that.

Here, the trial court stated that several other people were also nodding their heads at the question raised by the Commonwealth, but the Commonwealth only struck one other person—Juror 702. Juror 702 referenced knowing the term as being associated with the death of Breonna Taylor but affirmed that he could remain impartial. However, Juror 661 stated that he in fact did believe the system was broken because: "Look at what is happening to President Trump. That should answer it." He was not questioned further by the Commonwealth, and he did not inform the Commonwealth that he could remain impartial. These facts—taken into consideration that the Commonwealth argued other race-neutral reasons for striking Juror 545 that were strictly rejected by the trial court—indicate discriminatory intent. *See id.* Thus, we hold the Commonwealth's proffered race-neutral reason to be a pretext for discrimination.

12

After reviewing the record, we hold that the trial court erred in ruling that the Commonwealth proffered sufficient reasons to overcome the *Batson* challenge. As a result, Baskin's Equal Protection rights were violated. Therefore, although the evidence was sufficient to convict Baskin, "we are compelled to reverse this case for a new trial because of the prosecutor's failure to follow the *Batson* rule in exercising peremptory challenges." *Washington*, 34 S.W.3d at 380.

## B. Baskin was not entitled to a directed verdict on aggravated trafficking in fentanyl greater than 28 ounces.

Baskin was charged and convicted of aggravated trafficking in fentanyl under Kentucky Revised Statutes ("KRS") 218A.142(1)(b). KRS 218A.142(1) states: "(1) A person is guilty of aggravated trafficking in a controlled substance in the first degree when he or she knowingly and unlawfully traffics in: . . . (b) Twenty-eight (28) grams or more of fentanyl[.]" "'Fentanyl' means a substance containing any quantity of fentanyl, or any of its salts, isomers, or salts of isomers[.]" KRS 218A.010. At trial, Baskin moved for a directed verdict on this charge, arguing that the Commonwealth failed to present evidence that established an actual, quantified amount of fentanyl. Therefore, the Commonwealth failed to demonstrate the twenty-eight-gram threshold required for conviction under KRS 218A.142. The Commonwealth argued that the jury could reasonably infer that there were twenty-eight grams of fentanyl because two pills tested positive for fentanyl. Ultimately, the trial court denied the motion, finding that the jury could reasonably infer that all of the pills

13

contained fentanyl because the two pills were selected at random and had the same appearance.  On appeal, Baskin alleges that the trial court erred when it denied his motion for a directed verdict.

First, this issue is preserved for appeal.

> [I]n order to preserve an alleged directed verdict issue for appeal, <u>criminal defendants must</u>: (1) move for a directed verdict at the close of the Commonwealth's evidence; (2) renew the same directed verdict motion at the close of all evidence, unless the defendant does not present any evidence; and identify the particular charge the Commonwealth failed to prove, and must identify the particular elements of that charge the Commonwealth failed to prove.

*Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020).  After the Commonwealth rested its case, Baskin moved for a directed verdict on the charges for aggravated trafficking of a controlled substance in the first degree, alleging that there was no quantifiable amount testified to that would get the Commonwealth to twenty-eight grams of fentanyl.  The trial denied Baskin's motion for a directed verdict.  Furthermore, Baskin did not present any evidence.  Thus, renewal of the directive verdict was not required.  *Id.*

When ruling on a motion for directed verdict:

> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth.  If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given.  For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).  "The evidence presented by the prosecution must be more than a mere scintilla."  *Id.*  "When

14

the denial of a properly preserved verdict motion is challenged on appeal, the standard of review is likewise whether, viewing the evidence in light most favorable to the Commonwealth, any rational juror could have found all the elements of the crime." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 35 (Ky. 2011).

On appeal, Baskin argues that taking all the facts in light most favorable to the Commonwealth, there was not sufficient evidence to support an inference that Baskin was in possession of twenty-eight or more grams of fentanyl. Baskin alleges that the test results and visual appearance of the drugs are insufficient for the jury to infer the contents of the pills.

> Detective Grimsley testified that there were 835 of each kind of pill, or 1670 total tablets. Each tablet needed to weigh approximately 52 milligrams to reach the weight of the whole. Therefore, to reach the 28-gram threshold, at least 537 of the 1670 tablets need to contain fentanyl. If the amount was 536 tablets—i.e., an amount insufficient to prove aggravated tracking—the first two tablets randomly tested would be positive for fentanyl more than 10% of the time. In other words, the first two pills testing positive for fentanyl means that the bag contains the required amount of fentanyl less than 90% of the time. Generally, a finding is only statistically significant if it is correct more than 95% of the time— and then usually with many more repetitions than 2 out of 1670.

Furthermore, Baskin argues that the pills were most likely manufactured by a criminal organization. Thus, many of the pills likely contained counterfeit oxycodone. Ultimately, Baskin argues that more of the pills should have been tested to establish that there were twenty-eight grams of fentanyl. Without this evidence, the jury was left to assume that enough of the pills contained fentanyl to weigh twenty-eight grams, which they could not reasonably do.

First, we want to clarify that Detective Grimsley testified that there were approximately 835 blue and green pills in total. Thus, we reject Baskin's assertion that there were 1670 total tablets. Furthermore, the blue and blue-green pills were not separated into separate categories. Upon reviewing the evidence, these pills were located in a single bag together. The main distinction was that several tablets had an imprint code[3] that stated "M30," and others had an obscured imprint code. Despite this discrepancy, the main issue remains the same. We must determine whether a rational juror could have found all elements of KRS 218A.142(1)(b) when the Commonwealth tested only two of 835 pills.

Viewing the evidence in light most favorable to the Commonwealth, a rational juror could have found all the elements of the statute were met, and that each of the two pills contained the same controlled substance. *Taylor v. Commonwealth*, 984 S.W.2d 482, 484–85 (Ky. 1998). In *Taylor,* Taylor was charged with trafficking in marijuana greater than eight ounces and less than

---

[3] The FDA requires most prescription and over-the-counter solid oral medications to bear a unique imprint code for identification purposes. *See* 21 C.F.R. § 206.10. 21 C.F.R. § 206.10(a) states:

> Unless exempted under § 206.7, no drug product in solid oral dosage form may be introduced or delivered for introduction into interstate commerce unless it is clearly marked or imprinted with a code imprint that, in conjunction with the product's size, shape, and color, permits the unique identification of the drug product and the manufacturer or distributor of the product. Identification of the drug product requires identification of its active ingredients and its dosage strength. Inclusion of a letter or number in the imprint, while not required, is encouraged as a more effective means of identification than a symbol or logo by itself. Homeopathic drug products are required only to bear an imprint that identifies the manufacturer and their homeopathic nature.

five pounds. *Id.* at 483. Although ninety-eight marijuana plants were seized, only six of those plants were tested. *Id.* We held that although only a portion of marijuana was tested, the jury could still find that the entire amount was the same controlled substance. *Id.* at 484–85. In finding that the evidence supported the jury's finding that all ninety-eight plants were marijuana, we relied on the following factors:

> [A] proper random selection procedure was employed; the tested and untested substances were contemporaneously seized at the search scene; the tested and untested substances were sufficiently similar in physical appearance; the scientific testing method conformed with an accepted methodology; all of the samples subjected to scientific analysis tested positive for the same substance; and the absence of evidence that the untested substance was different from the tested substance.

*Id.* (citing *United States. v. Scalia*, 993 F.2d 984 (1st Cir. 1993). The Commonwealth argues that these factors support a finding that there was at least twenty-eight grams of fentanyl.

> Here, Detective Hughs [sic] testified that he randomly pulled two pulls out of each group of pills—the blue pills and the green pills— to send to the lab. He also testified that it was standard procedure to send in random samples when testing part of a suspected controlled substance. Second, in his report, the lab technician described the blue group of pills that he weighed as numerous round blue tablets marked "M30." The green group of pills that he weighed as numerous blue-green tablets with obscured markings, along with fragments and powder. Although he did not utter the words "they all looked alike," he did describe each group as looking alike. The trial court acknowledged this when he stated, "We've got the pills, and I can look at them and I can see—you know what? They all look the same."
>
> The lab technician described his testing methods and stated that they were accepted by the scientific community, and defense counsel did not argue otherwise. Both pills tested positive for the same substance—fentanyl. Finally, there is no evidence that the untested pills were anything different from the tested pills.

17

Although Baskin states in his brief that the evidence shows that the blue pills could be counterfeit fentanyl pills, this is clearly not the case. On cross examination, the lab technician explained that tablets from a pharmacy marked "M30" will be oxycodone. Because the tablet marked "M30" tested positive for fentanyl, they were counterfeit oxycodone—in other words, they looked like oxycodone, but they were fentanyl. There was no reason to believe any of the tablets were legitimate oxycodone tablets.

We agree. Under these circumstances, the jury was able to view the pills and reasonably infer that all of the pills were the same. *Taylor*, 984 S.W.2d at 484–85. Considering all of the evidence, the trial judge did not err in denying the motion for a directed verdict. We affirm the judgment of the trial court on this issue.

## C. Baskin was not prejudiced by the Commonwealth's use of video evidence.

Baskin alleges that he was prejudiced when the Commonwealth played body camera video concerning the investigation into an alleged sexual assault of Welman. Baskin further alleges that he was prejudiced when the Commonwealth used evidence of the body camera footage in closing arguments. Baskin concedes that the issue is not preserved. However, he requests palpable error review.

> [A]n unpreserved error may be noticed on appeal only if the error is "palpable" and "affects the substantial rights of a party," and even then relief is appropriate only "upon a determination that manifest injustice has resulted from the error." An error is "palpable," . . . only if it is clear or plain under current law, and in general a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment."

*Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009) (internal citations omitted). Manifest injustice means that "the error so seriously affected the

18

fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Id.*

Baskin alleges that the introduction of the video footage was unrelated to the incident. Thus, we will first address relevancy. "[E]vidence must be relevant to be admissible. KRE[4] 401 provides that evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Burdette v. Commonwealth*, 664 S.W.3d 605, 615 (Ky. 2023). We hold that the video footage presented to the jury was relevant to substantiating the charges against Baskin.

Baskin was charged with first-degree aggravated trafficking in a controlled substance (first offense, fentanyl), first-degree trafficking in a controlled substance (first offense, methamphetamine), possession of drug paraphernalia, alcohol intoxication in a public place, and being a first-degree persistent felony offender. At trial, the jury was shown over an hour of body camera footage from the responding officers where Baskin was interacting with them. The video footage was relevant because it allowed the jury to consider whether the defendant's proximity to the vehicle indicates control over the controlled substances. The vehicle belonged to Lakesha Hewitt. Thus, the issues of ownership and control of the vehicle were important to this case. Furthermore, the video footage shows that Baskin informed officers that he was

---

[4] Kentucky Rules of Evidence.

with an individual named Jeffery or "T.T.," T.T.'s girlfriend, and Welman. He told officers that T.T. and T.T.'s girlfriend were walking the trail in the woods together, and Baskin and Welman walked back to the vehicle because Baskin forgot his cigarettes. Baskin further gave a broken timeline of events that involved T.T. driving the vehicle. This information is relevant because it is inconsistent with Baskin's whereabouts on the night in question, and who had control of the vehicle. The video footage clearly shows that no other people were present besides Baskin and Welman. It likewise provides an explanation for the officers' lack of investigation into T.T. or T.T.'s girlfriend because there was cumulative evidence from the video footage that others were not around. Through Baskin's interactions with officers, the jury could also consider whether Baskin was communicating in a way in which he appeared to be intoxicated. The video also shows officers giving a basis for the initial arrest, as the officers told Baskin that he had a very strong odor of alcohol. Therefore, the officer's body camera footage was relevant evidence under KRE 401.

The jury was also shown video footage from a gas station in the early morning of April 27, 2023. This footage is relevant because it shows Baskin pulling into a gas station while driving the vehicle that contained the controlled substances. Furthermore, it contradicts Baskin's timeline of events from that morning, including Baskin's story that T.T. and T.T.'s girlfriend were with Baskin on the morning in question. Baskin is seen buying condoms in a gas station and subsequently picking up Welman. No other individuals appeared to be in the vehicle with Baskin. Thus, all of the video footage presented to the

jury was relevant to establishing Baskin's connection to the vehicle that contained fentanyl and methamphetamine. Moreover, it was relevant because it demonstrated that Baskin misled officers in this investigation.

Baskin argues that while some of the footage contains relevant evidence, part of the footage was improper character evidence because it presents Baskin as the "kind of guy" who would be trafficking drugs. Baskin alleges that the evidence that he purchased condoms and his apparent lies about the individuals he alleged at the scene cast Baskin "in a negative light." Baskin further claims that it was improper for the Commonwealth to utilize the videos to represent that Baskin was lying to police officers in its closing statements. He argued:

> The defendant, through a combination of booze and lies, couldn't articulate more than the same story he had been talking to officers for over two hours. You know this. I made you sit through every second of it. I didn't do that because I thought it was fun. I didn't do that because I wanted to just pick that evidence. I did it because for you to get the story and for you to see everything, you had to sit there and watch two hours of lies. Every single provable lie.

Baskin's claims are unsubstantiated. Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." KRE 404. However, the video evidence did not constitute impermissible character evidence. Rather, it was directly probative of whether Baskin committed the charged offenses. Baskin's purchase of condoms on the morning in question was relevant to establishing his whereabouts and connection to the vehicle. This point was clarified before trial when defense counsel advised the court that

21

there was no valid objection to the condom evidence, provided it was admitted solely to support the Commonwealth's theory that the defendant had lied to officers. The Commonwealth's remarks during closing were not improper because they merely advanced its theory that the defendant provided false statements to officers regarding material facts tied to the alleged crime. Thus, this was not improper character evidence under KRE 404.

Moreover, Baskin claims that the video evidence was not permissible under KRE 404(b) because it showed evidence of another crime, as Baskin was being investigated for sexual assault. This claim is also unsubstantiated. Under KRE 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Here, the jury was not given any evidence of Welman's sexual assault allegations. The body camera footage focused solely on Baskin's interactions with officers, and it went silent when any statements regarding Welman's allegations were mentioned. The allegations only play a role in the case as officers obtained the evidence of the current charges while investigating the sexual assault claims. Although the video showed evidence of Baskin's broken belt buckle and his purchase of condoms, the jury had no context from which to draw any improper inferences regarding this evidence. On review of the evidence, we hold that the body camera footage does not provide a basis from which the jury could reasonably conclude that Baskin was being investigated for sexual assault. Thus, it was not improper under KRE 404(b).

22

Next, Baskin argues that he was unduly prejudiced by the introduction of the video footage. We disagree. "If relevant, then KRE 403 requires the trial court to assess whether its 'probative value is substantially outweighed by the danger of undue prejudice.'" *Burdette,* 664 S.W.3d at 615. The jury was not presented with evidence of any other crime and was limited to considering only Baskin's interaction with law enforcement. Therefore, the video footage did not unduly prejudice Baskin.

Baskin also alleges that based on the defense counsel's statement that "usually the Commonwealth shows us the evidence before they just pop it on," was evidence of a KRE 404(c) violation. We reject Baskin's argument that the Commonwealth failed to provide the required notice under KRE 404(c). It is clear from the record that Baskin had access to all evidence through discovery. The Commonwealth merely redacted all evidence of the sexual assault allegations. Furthermore, the court directed the Commonwealth to skip over the parts of the video where Baskin was not engaging with officers. Baskin had all video footage before it was presented to the jury, and the court only permitted parts of it to be played. This does not amount to a KRE 404(c) notice violation.

Lastly, Baskin argues that, in the alternative, we should reverse and remand this case for prosecutorial misconduct arising from comments made during closing arguments. Namely, that "[t]he defendant didn't just surround himself with these illegal drugs. He surrounded himself with imaginary friends and provable lies." We reject Baskin's argument that these comments

23

constitute prosecutorial misconduct. First, this issue was not preserved for appeal. Despite this, Baskin contends that this Court should grant relief because the prosecutorial misconduct was flagrant. *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010) ("Where there was no objection, we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair."). Baskin asks this Court to consider the four-factor test in *Dickerson v. Commonwealth* to determine whether the misconduct was flagrant. 485 S.W.3d 310, 329 (Ky. 2016).

> We use the following four-part test to determine whether a prosecutor's improper comments constitute reversible flagrant misconduct: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*Id.* (quoting *Mayo v. Commonwealth*, 322 S.W.3d 41, 56 (Ky. 2010)) (internal quotations omitted). Here, we do not find the prosecutor's comments to be improper, and we reject Baskin's argument that there was prosecutorial misconduct. Therefore, we need not reach the question whether the alleged misconduct rises to the level of flagrant misconduct because it did not constitute misconduct at all. *Id.* at 332.

Baskin has failed to show that error was committed. Because this issue was unpreserved and Baskin has failed to show palpable error, we affirm the trial court.

24

## D. Baskin was not prejudiced by Detective Grimsley's testimony.

Baskin alleges that Detective Grimsley gave improper expert opinions on three topics: (i) Welman's possible intoxication on methamphetamine at the time of the incident, (ii) untested residue found in the vehicle alleged to be methamphetamine, and (iii) the significance of cash in a trafficking investigation. Baskin concedes that topics (i) and (ii) are not preserved. However, he requests palpable error review.

At the outset of his testimony, Detective Grimsley testified that he had fifteen years' experience in law enforcement. Furthermore, he had between two and three hundred encounters with illegal drugs, and he had encountered methamphetamine in various consistencies. He then testified on direct examination that he believed Welman was under the influence of methamphetamine.

> **Q.** What observations did you make about Ms. Welman?
>
> **A.** She was very frantic. She was difficult to essentially formulate a complete thought or complete train of thought. I would call her almost manic, very paranoid, emotionally distraught and unstable.
>
> **Q.** Do you often come into contact with individuals who are demonstrating such behavior in your role as a CID detective?
>
> **A.** At times, yes.
>
> **Q.** In your training and experience as a law enforcement officer, is that type of behavior indicative of anything?
>
> **A.** Yes, I would say the behavior that Ms. Welman was exhibiting was indicative of being under the influence of a stimulant, specifically what I believe to be methamphetamine.

Detective Grimsley also testified that he believed that the crystalized flakes found in the front seat of the vehicle where Welman was sitting were suspected to be crystal methamphetamine. Here, Detective Grimsley's testimony was permissible because it was based on his experience as a detective having dealt with several drug investigations specifically involving methamphetamine. *See Sargent v. Commonwealth*, 813 S.W.2d 801, 802 (Ky. 1991) (holding that police officers, based on their several years of experience, could form an opinion that possession of marijuana was intended for sale); *see Dixon v. Commonwealth*, 149 S.W.3d 426, 430–31 (Ky. 2004) (holding that an officer's opinion testimony in a trafficking case was admissible because it was grounded in the officer's thirteen years of experience and specialized training in narcotics investigations). The Commonwealth established a sufficient foundation for Detective Grimsley to offer this testimony. Furthermore, even if Detective Grimsley was not properly designated as an expert, this does not rise to the level of palpable error. *See McGuire v. Commonwealth*, 595 S.W.3d 90, 96 (Ky. 2019).

> [The testifying officer's] testimony indicates that his opinion was based on his many years' experience as a police officer encountering individuals in possession of drugs. He testified that he had been a patrol officer for over five years and that, during that time, he had dealt with other individuals who were in possession of controlled substances. Based upon this background, we cannot say that the trial court's failure formally to qualify [the officer] as an expert witness before allowing him to offer the testimony at issue created a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law."

26

*Id.* Thus, we find that the trial court did not err in allowing Detective Grimsley to testify regarding topics (i) and (ii). Because this issue was unpreserved and Baskin has failed to show palpable error, we affirm the holding of the trial court.

Baskin also contends that Detective Grimsley's testimony regarding this topic (iii) was improper. Detective Grimsley testified regarding the significance of cash in a trafficking investigation. This issue is preserved for appeal because Baskin objected to Grimsley's testimony based on his lack of qualifications, and the trial court ruled on the objection. *See Bell,* 473 S.W.2d at 820. We review a trial court's ruling on evidentiary matters for abuse of discretion. *Woodard v. Commonwealth,* 147 S.W.3d 63, 67 (Ky. 2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Id.* (quoting *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky. 2000)).

We hold that the trial court did not abuse its discretion when allowing Detective Grimsley to testify regarding the significance of cash in a trafficking investigation. Baskin was found with $1,014 in cash when officers initially arrived at the scene. It was permissible for Detective Grimsley to render his opinion regarding the significance of cash in a trafficking investigation based on his experience as a detective having fifteen years' experience in law enforcement and two to three hundred encounters with illegal drugs. *See Sargent,* 813 S.W.2d at 802; *Kroth v. Commonwealth,* 737 S.W.2d 680, 681 (Ky. 1987); *Dixon,* 149 S.W.3d at 430–31.

27

Baskin also contends that the Commonwealth failed to designate Detective Grimsley as an expert. However, "a trial court has wide latitude in deciding how to test an expert's reliability and in deciding whether or when special briefing or other proceedings . . . is needed to investigate reliability." *Id.* at 430. "[A] police officer's opinion based on training and experience as to whether . . . there was or was not evidence of a forced entry, 'can be distinguished from the more extensive and complex knowledge required for testimony by traditional experts, such as accident reconstructionist and forensic pathologists.'" *Id.* This Court has recognized, where a sufficient foundation is established, officers' testimony has been "routinely admitted in drug cases." *Id.* (citing *United States v. Ortega*, 150 F.3d 937, 943 (8th Cir. 1998); *United States v. Tejada*, 886 F.2d 483, 486 (1st Cir. 1989); *United States v. Carmona*, 858 F.2d 66, 69 (2d Cir. 1988); *United States v. Merritt*, 736 F.2d 223, 228 (5th Cir. 1984); *Sargent*, 813 S.W.2d at 801; *Kroth*, 737 S.W.2d at 680)). The Commonwealth established a sufficient foundation for the detective to offer this testimony. Therefore, the trial court did not abuse its discretion. We affirm the judgment of the trial court on this issue.

### III.    Conclusion

Because there was a *Batson* violation, which is a structural error, we are compelled to reverse this case for a new trial. *Washington*, 34 S.W.3d at 380. We hold that Baskin's remaining claims lack merit. The judgment and sentence of the Warren Circuit Court are reversed, and this matter is remanded for further proceedings consistent with this opinion.

28

All sitting.  Bisig, Conley, Goodwine, Nickell and Thompson, JJ., concur.

Keller, J., concurs in result only.

COUNSEL FOR APPELLANT:

Timothy G. Arnold
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General